## CHESHIRE.

ASHUELOT R. R. CO. & a. v. ELLIOT & a.

A reserved power of amending and repealing the charter of a corporation is a legislative power.

The foreclosure of a mortgage is not an exercise of legislative power.

MOTION, for a rehearing of questions decided in 52 N. H. 387, and 57 N. H. 397.

*G. A. Torrey* (with whom were *Cushing* and *Faulkner*), for the Cheshire R. R. Co.

The acts of 1861 and 1866 were constitutional, under the reserved power of altering and amending the chartered rights of the Ashuelot R. R. Co. The provision in the original charter (of which the court take judicial notice, *Hall* v. *Brown*, 58 N. H. 93) is,—"The legislature may alter or amend the provisions of this act, for cause assigned, notice being given to the corporation, affording them a sufficient opportunity to be heard, and not otherwise ; and may repeal this act for a violation thereof." Laws of 1846, *c.* 394, *s.* 9. "The legislature may at any time alter, amend, or repeal the charter, or modify or annul the powers of any corporation." Gen. St., *c.* 133, *s.* 18. This section is conclusively presumed to have been enacted after due notice, and for sufficient cause. The corporation accepted, as a part of its charter, the provision of the "Act to render railroad corporations public." Laws of 1844, *c.* 128. By thus becoming a public corporation, it is subject to legislative control, like municipal corporations.

The reservation of the right to modify the powers of the corporation authorizes any change in the contract, or its entire revocation ; and such change or revocation is made with the consent of the corporation and its stockholders. *Tomlinson* v. *Jessup*, 15 Wall. 454 ; *Miller* v. *State*, id. 478 ; *Holyoke Co.* v. *Lyman*, id. 500 ; *Story* v. *J. C. & B. P. P. R. Co.*, 1 C. E. Green 14 ; *Hyatt* v. *McMahon*, 25 Barb. 457 ; *N. R. R. Co.* v. *Miller*, 10 Barb. 260 ; *S. & S. P. R. Co.* v. *Thatcher*, 1 Kernan 102 ; *White* v. *S. & U. R. R. Co.*, 14 Barb. 559 ; *Sherman* v. *Smith*, 1 Black 587 ; *English* v. *N. H. & N. Co.*, 32 Conn. 240 ; *Comrs.* v. *H. W. P. Co.*, 104 Mass. 446 ; *Munn* v. *Illinois*, 94 U. S. 113 ; *C. B. & Q. R. R. Co.* v. *Iowa*, id. 155. "Acts of the legislature are not within the above prohibitions, unless they operate on the interest of individuals, or of private corporations. Nor are they within them when, in an implied or express manner, the parties affected have consented to their passage." *Merrill* v. *Sherburne*, 1 N. H. 199, 213. Elliot had been in possession six months. He could

have published notice in a newspaper, and foreclosed within six months thereafter. The act of 1861 extended the time of redemption from six to twelve months ; and of this enlargement of the right of the corporation, the corporation cannot complain. It would be a strange doctrine, that the legislature, having reserved the power to alter the charter or to repeal it entirely, could not make this change in the corporate rights. The act must be presumed to be not for mere foreclosure of the mortgage, but for the public good.

*Lane*, for the plaintiffs.

Doe, C. J. As there has been a trial by the master since the announcement of the decisions which we are asked to reconsider, the motion for a rehearing is not seasonably made. And as justice has been done by a special revisory decree, adjusting the accounts of the parties upon equitable principles, there is nothing to take the case out of the general rule which requires such a motion to be presented before the questions of fact are tried in pursuance of the decision of law. But we have not allowed the position of the case to prevent a consideration of the argument advanced against the former decision on the question of legislative power.

In this state the unlimited power transferred from the British parliament to the revolutionary and provisional government of 1776, and exercised by that government in legislative decrees banishing persons and confiscating property without trial and without notice, came to an end on the second day of June, 1784. On that day private rights were protected by a separation of the powers of government. From that day to this the legislative power has been vested in the senate and house of representatives, and the judicial power (with exceptions not applicable to this case) has been vested in another branch of the government by constitutional provisions preceded by the declaration that "In the government of this state, the three essential powers thereof—to wit, the legislative, executive, and judicial—ought to be kept as separate from and independent of each other as the nature of a free government will admit, or as is consistent with that chain of connection, that binds the whole fabric of the constitution in one indissoluble bond of union and amity."

The separation of powers was introduced as a vital principle of free institutions by statesmen who had adopted the view of Montesquieu. "There is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control ; for the judge would be then the legislator. * * * In the republics of Italy, where these three powers are united, there is less liberty than in our monarchies." Spirit of Laws, *b.* 11, *c.* 6. " It is by balancing each of these powers against the other two, that the efforts in human nature towards tyranny can alone be checked and restrained, and any degree of freedom preserved." 4 Works of John Adams 186. " If

the three powers are united, the government will be absolute, whether these powers are in the hands of one, or a large number. The same party will be the legislator, accuser, judge, and executioner.   *   *   * If the legislative and judicial powers are united, the maker of the law will also interpret it; and the law may then speak a language dictated by the whims, the caprice, or the prejudice of the judge, with impunity to him." Essex Result, Life of Parsons 373. Of the three powers, Jefferson says,—" The concentrating these in the same hands is precisely the definition of despotic government. It will be no alleviation that these powers will be exercised by a plurality of hands, and not by a single one. One hundred and seventy-three despots would surely be as oppressive as one. Let those who doubt it turn their eyes on the republic of Venice. As little will it avail us that they are chosen by ourselves. An elective despotism was not the government we fought for." Notes on Virginia, Query 13. " The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." Madison, in The Federalist, No. 47. " I agree," says Hamilton, " that there is no liberty, if the power of judging be not separated from the legislative and executive powers." The Federalist, No. 48. " The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism." Washington's Farewell Address.

The convention by whom our constitution was framed, in their addresses to the people recommending its adoption, say, the government of the Revolution, instituted in haste and agitation, was not intended to be lasting, but was expressly declared to be temporary (established " to continue during the present   *   *   *   contest with great Britain ") : one of its innumerable defects was the want of an exclusion bill, in consequence of which many members of the legislature " assist in enacting laws, in explaining and applying them, and in carrying them into execution : " it is not strange that such persons, and all who are vested with those " powers, should be backward in receiving and approving a constitution that so remarkably retrenches them,— that sets out, in direct opposition to the present one, with this position, that the three essential powers of government ought ever to be kept totally independent of each other. It is not strange, it is perfectly natural, and the fact is fully verified by the length of time which the present form of government has been permitted to continue.   *   * The three powers of government before hinted at, to wit, the legislative, or power of making laws; the judicial, or power of expounding and applying them to each particular case ; and the executive, to carry them into effect,—these three important powers we have thought proper to keep as separate and distinct as possible, for the following reasons : If they should be all united, the government would then be a complete system of tyranny. The same party would be legislator, accuser, judge, and executioner. If the legislative and judicial powers

should be united, the maker of the law would be the interpreter thereof, and might make it speak what language best pleased him, to the total abolition of justice." 9 Prov. Papers 846, 847, 878, 879. The separation of powers must be presumed to have been adopted by the people on the grounds thus stated by the convention.

Nothing having been done by anybody by authority, or in pursuance of the acts of 1861 and 1866 (52 N. H. 390), the Cheshire Railroad Company is not benefited by those acts unless the act of 1861 operated, a year after its passage, as a foreclosure of the mortgage of the railway of the Ashuelot company. And an amendment or repeal of the Ashuelot charter being as plainly a legislative act as the grant of the charter, the question whether a foreclosure of the mortgage is an exercise of legislative power is not advanced by inquiring what amount of legislative power is retained by the statutory reservations of a right of amendment and repeal. If a foreclosure of the mortgage is not a legislative act, the reservations are immaterial, since, whatever legislative power was reserved, no power was reserved that is not legislative.

The Ashuelot charter is a statute. An amendment or repeal of it would be another statute. And the power of making the second is not constitutionally greater than the power of making the first. A statute of incorporation is a legislative grant, held by the federal court to be a contract and a creation of private rights, protected, in the absence of a reservation, by the contract clause of the federal constitution. But calling it a charter, a grant, or a contract, does not make it anything more than an exercise of legislative power. A reservation of the right to amend and repeal it is an exercise of the same power,—a legislative retention not of judicial or executive but of legislative power, and not a creation of any power, legislative, judicial, executive, or extra-constitutional. It has the negative effect of preventing the statute of incorporation being exempted by the contract clause from the legislative power of amendment and repeal, and putting it on an equality with other statutes that are not contracts, and are subject to that power. By not giving it a superior position, the legislature leave it on that level of subjection.

The reserved power of amendment and repeal is not anything more than the legislature would have had without a reservation, if statutes of incorporation had been held to be possessed of the ordinary, amendable, and repealable quality of other statutes. With a reservation of that power, an act of incorporation, regarded as a grant, is an alterable and revocable grant, a gift or conveyance of something, a part or the whole of which the grantor can, without the grantee's consent, take back or destroy. If the Ashuelot charter had contained an unlimited reservation of the legislative power of amending and repealing the legislative grant, the state would have reserved, and the corporation by accepting the charter would have consented to the reservation of, the power of taking from the corporation by legislation nothing more than that which, by legislation, the state had granted to it. Its

existence, derived from the state, could be terminated by the state. But its right of redemption, like the mortgagee's right of foreclosure, is a piece of private property that cannot be taken away by a revocation of the charter, because it was not given by the charter. Of that property there is no state grant to be rescinded. It could not be granted by the state, because the state had not created or owned it. If it had been granted by the state, there might have been a question that is not raised in this case.

The Ashuelot company holds its equity of redemption as trustee for the stockholders, as Elliot holds the right of foreclosure in trust for the bondholders. An amendment of the charter would not be an exercise of a higher constitutional power than would be employed in a repeal of the charter. And a repeal would not leave the equity of redemption in a worse plight than it would have been in if the same investment had been made, without a charter, in the name of some other trustee, and the trustee had died. The law cannot suffer a trust to fail for want of a trustee ; for the beneficiaries have a private right in the trust estate, which is as inviolable as property similarly invested without a trustee   If, with the consent of the stockholders, the charter of a railroad corporation were repealed, its right of way abandoned, and its business discontinued, its real estate held in fee would not escheat, and its rolling-stock and cash would not pass to the state as wrecked goods or treasure-trove. The corporate property remaining in existence could not be confiscated by a legislative decree, and the right of the stockholders to a distribution of the assets through the agency of a trustee or receiver, or other legal process, could not be denied without a repudiation of constitutional duty. . The question whether the termination of this equity of redemption by foreclosure is a legislative act is not affected by the circumstance that the mortgagor is incorporated.

Railway corporations being common carriers, are engaged in a public service. They are public corporations so far as the protection of the public rights is concerned ; and their ways, taken for public use, like other highways, are public. Gen. St., c. 146, ss. 1, 2, 3 ; McDuffee v. P. & R. Railroad, 52 N. H. 430, 448, 449, 454. If the public, at its own expense, buys a right of way and builds a road, as in the case of an ordinary town highway, it owns what it buys and pays for. But if, instead of making such an investment of its own money, it allows a turnpike company to take and pay for the right of way and build the road, the public is not the proprietor of the road, as it was not of the money which the company expended. Its right is a right of travel for a reasonable toll. Its right in a railway, owned not by itself but by an incorporated or unincorporated common carrier, is a right of reasonable transportation for a reasonable price. In this case, the mortgaged property being subject to a public use, its owner cannot withhold from the public the use to which it is entitled ; but the equity of redemption being private property, the public power to divest the owner of it for the private benefit of the mortgagee

cannot rest on the public right of reasonable transportation at a reasonable price. Over the corporation as a common carrier, and over its road as property devoted to a public use, the public power is sufficient for the maintenance of the public rights, but not for the extinction of the private title for a private purpose. It is no more an exercise of legislative power to decree a foreclosure of this mortgage of private property subject to the public right of transportation, than it is to decree a foreclosure against other private property.

It does not appear that there was any public interest to be promoted by a legislative foreclosure. And if there had.been such an interest, it does not appear how the public character of that interest would have changed the legal nature of a foreclosure. If in the absence of such an interest a foreclosure would not be an act of a legislative character, it is not apparent how its public utility could give it that character. If the public were the mortgagee, and had every possible interest to deprive the mortgagor of the equity of redemption, that equity would still be private property ; for the public would not mortgage its own property to itself. And the question would remain whether a foreclosure is a legislative act. And if the act of 1861 had declared itself to be not an adjudication of private rights, but a protection of the public interest and a regulation of the exercise of the public right of transportation, it would still have been necessary to go into the same inquiry.

The railway, including the right of redemption and the right of foreclosure, may be sold by the power of uniform taxation exercised for a public purpose, compensation being made to the owners in the common benefits of government. And a sale of it for taxes would exhibit the private character of the property. Compensation being made, it may be taken by eminent domain for public use. *Crosby* v. *Hanover*, 36 N. H. 404, 420 ; *W. R. Bridge Co.* v. *Dix*, 6 How. 507 ; *R. F. & P. R. Co.* v. *L. R. Co.*, 13 How. 71, 83 ; Cooley Const. Lim. 526. But the right of redemption was taken neither by the public nor for the public. The public right of using the road was the same before the foreclosure of 1861 as afterwards ; and by the foreclosure, the exercise of that right was not regulated. The direct, legal, and practical effect of the act, if it were valid, would be to put an end to the right of the mortgagor, not for the public good, but for the private good of the mortgagee. The public might reap some indirect advantage from a foreclosure, turning the mortgage into an absolute deed. The public might derive a greater advantage from a decree removing the encumbrance, and making the mortgagor's title indefeasible. It might derive a still greater advantage from a decree giving the merged rights of the mortgagor and mortgagee to a third person. It might profit by the transfer of some shops, mills, and farms from their owners to others more thrifty, more enterprising, more generous, more patriotic, or less immoral. But the direct or indirect public interest in such a transfer is not the test of its legislative character.

Calling the legislative act of incorporation a grant, and the legisl tive act of amendment or repeal a modification or revocation of the grant, does not convey to the legislature a power that is not legislative, nor bestow the character of legislation upon an act not otherwise endowed with that character, nor authorize either branch of the government, or all the branches combined, to make a special decree extinguishing a certain mortgagor's private right of redeeming certain property, for the benefit of the mortgagee, or extinguishing the mortgagee's private right of foreclosure, for the benefit of the mortgagor, without consent, without compensation, without trial, and without notice. Such an act is not an exercise of the legislative, the judicial, or the executive power established by the constitution. It is an exercise of a power not tolerated by the constitution, because not compatible with the liberty the constitution was designed to secure. As neither of the branches of government can acquire, by its own act of reservation, any power exclusively vested by the constitution in either of the others, so neither can acquire, by its own act of reservation, that unlimited power which passed from the British parliament to the provisional government in 1776, and was abolished in 1784. The legislative effort to protect public interests against a contractual abdication of legislative power, by a reservation making a charter amendable and repealable like other statutes that are not contracts, does not demolish the safeguards provided by the state constitution for private rights, does not unite powers which the constitution has separated, and does not revive the absolutism which the constitution extirpated nearly a hundred years ago.

A slight exercise of unconstitutional power by either department of the government is not less invalid than an extensive exercise of it. The question is not whether the act of 1861, if valid, would have been beneficial to the mortgagor, nor whether the foreclosure, decreed by that act, would, if valid, greatly vary from some other legal method. However slight the exercise of power compared with a repeal of the charter, however trifling the practical effect of it, and however insignificant the departure from other forms of procedure, the act of 1861, not being a legislative act, presents the difference between an unconstitutional foreclosure and a constitutional one.

The application to this case of an argument advanced by Webster, in an opinion given by him, in 1821, upon the validity of a Vermont statute granting a new trial in *Allen* v. *Hathaway & Pierson*, is decisive: " The standing laws of Vermont, proceeding on the principle that vested rights are not to be divested but by legal process and judicial proceeding, have authorized the supreme court of Vermont to grant new trials, for good cause shown, after judgment. In this very case, it was competent, and is now competent, for the supreme court to award a new trial. Now this must be the exercise either of a judicial or a legislative power. It cannot be both. If it is a power which may be constitutionally exercised by the legislature, for that reason it cannot be exercised by a judicial tribunal. Either therefore

he general law of Vermont is unconstitutional, or this act is so." {If the foreclosure of the Ashuelot mortgage is a legislative act, the general statute, directing in what court foreclosure suits shall be brought, is an attempt to authorize the court to make laws, and the judgments rendered in such suits, since 1784, are unconstitutional.}

It may be doubtful whether some acts are legislative or judicial: but in this case there is no doubt. The foreclosure of the mortgage of private property, like the rendition of a judgment on a bond secured by the mortgage, is a judicial act. It requires notice and an opportunity for a trial of the questions of the existence and amount of the debt, and the existence, legality, and effect of the mortgage. The foreclosure of 1861 would have been invalid if the decree, made by the legislature, had been made by either of the other departments of the government. The extinguishment of the mortgagor's title by a special governmental decree, without consent, compensation, trial, or notice, is not an exercise of any constitutional power.

*Motion denied.*