MERRIMACK.

---

STATE *v.* U. S. & CANADA EXPRESS CO.

Taxation is an equal division of public expense.
Chapter 63 of the General Laws is a provision for an unequal division of public expense, and is not authorized by the constitution.

DEBT, on Gen. Laws, *c.* 63.   The question of the constitutionality of the statute was reserved.

*E. B. S. Sanborn,* for the defendants.   I. Chapter 63, of the General Laws, is one of the fourteen chapters found under " Title 8, of Taxation."   The various chapters under this title treat of the following subjects :

Chapter 53—Of persons and property liable to taxation.
Chapter 54—Where and to whom to be taxed.
Chapter 55—Of the annual invoice of polls and estate.
Chapter 56—Of the appraisal of taxable property.
Chapter 57—Of the assessment and abatement of taxes.
Chapter 58—Of the collection of taxes of residents.
Chapter 59—Of the collection of taxes of non-residents.
Chapter 60—Of taxes in unincorporated places.
Chapter 61—Of the state board of equalization and their duties.
Chapter 62—Of the taxation of railroads and telegraph lines.

Chapter 63—Of the taxation or licensing of express companies.

Chapter 64—Of the taxation of legacies and successions, to defray the cost of probate courts.

Chapter 65—Of the taxation of bank stock, and deposits in savings-banks.

Chapter 66—Of extents.

Chapter 63 means taxation as surely as do all the chapters under title 8. Its license machinery is manifestly introduced to conceal a provision which in effect raises revenue by taxation, and its presence betrays a doubt of the constitutionality of the act unless the police power of the state can be invoked. Nevertheless, chapter 63 provides, in substance, for the taxation of a class of citizens. It is in conflict with every provision of the constitution for the raising of revenue. The New Hampshire constitution, part 2, art. 5, permits the general court "to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of and residents within the said state, and upon all estates within the same." The defendant company is a copartnership. It transacts business like other persons associated as copartners, and derives its right to do so from the same laws as such other persons derive their right to do business, and not from any special grant or privilege from the state. Any person has the right to engage in the same kind of business which the defendants follow.

The statute under consideration imposes a tax which is not "proportional." It singles out a small number of persons and a single occupation, and exacts two per cent. of the gross receipts of that one occupation. To be "proportional," it should require two per cent. of the gross receipts of all occupations to be paid into the treasury. To be "proportional," it is not enough that it is levied upon one entire class of citizens, but it should be upon all classes. The constitution does not require "proportional assessments, rates, and taxes" to be imposed upon individuals in the different classes of citizens, but "upon all the inhabitants of and residents within the said state, and upon all estates within the same;" that is, the rates shall be "proportional" among all individuals, and among all individual estates. The danger of unjust discrimination of individuals of the same class could not have been the evil sought to be avoided,— *e. g.*, taxing one express company two per cent. and another express company ten per cent. on gross receipts,—for no such evil ever existed under any civilized government. No system of taxation ever singled out an individual, and assessed him as such to the exemption of all others. Discrimination in assessing taxes always consists in taxing one class or several classes of citizens more than other classes. It was an evil which could exist, and not one which it was morally certain could not exist, that the constitution aimed to avoid; and a plain, common-sense construction is, that a tax upon one entire

class of citizens only, and the exclusion of other classes, does not conform to its provision that taxes shall be "proportional."

Nor is the tax imposed by chapter 63 "reasonable." The word "reasonable" cannot refer to the amount of tax to be raised. It is absurd to believe that the constitution attempted to limit the amount of tax which the people, through their representatives, should impose upon themselves. Reasonable, in this connection, must refer to an equal distribution of the burden of taxation. But we already have a judicial rendering of this clause of the constitution: "The equality here intended is, that the same tax shall be laid on the same amount of property in every part of the state, so that each man's taxable property shall bear its due proportion of the tax according to its value." "The word 'reasonable,' in this clause, seems to be used as having the same meaning with the word 'just,' and the sense of the clause to be, that taxes shall be laid not merely proportionally, but in due proportion, so that each individual's just share, and no more, shall fall on him." 4 N. H. 565.

In another sense, this law does not levy "proportional and reasonable" taxes. It establishes varying rates of taxation. The constitutional method of valuation is ignored by it, and an arbitrary standard established, which cannot conform always to the rate deduced from valuation. The defendants are assessed upon the property they own and use for the transaction of their business according to its valuation, and upon their gross receipts of money an arbitrary sum, without regard to their real value, even if such receipts can be deemed property. As well might a tax be assessed upon the wagons of the defendants according to their value, and upon their horses ten dollars each without regard to their value. The result of this law is, therefore, not only to assess the defendants for that which no other persons are assessed, but to impose on them different rates in their own taxes, as well as rates differing from those of all other "inhabitants" of the state.

The tax is not "proportional and reasonable" in its operation upon the different express companies. The gross receipts of one person doing express business may be very large, but wholly expended in carrying on his business, while the gross receipts of another expressman may be much smaller, but largely profit.

In other states, under constitutional provisions requiring proportional, uniform, or equal rates of taxation, enactments like chapter 63 have been pronounced unconstitutional. In Wisconsin, under a constitutional provision that "the rule of taxation shall be uniform," a law compelling railroads and plank roads to pay a tax of one per cent. upon gross earnings was held unconstitutional. *Attorney-General* v. *Winnebago Co.*, 11 Wis. 35. In Ohio, Louisiana, California, and Missouri, under constitutional provisions requiring uniformity in the modes of assessing taxes, laws requiring railroads, express companies, telegraph companies, etc., to pay

a certain per cent. upon incomes, which did not also apply equally to other persons, have been held unconstitutional and void. *Knowlton* v. *Supervisors*, 9 Wis. 414; *People* v. *McCreery*, 34 Cal. 461, in effect overruling the decision in *People* v. *Coleman*, 4 Cal. 46; *Bank* v. *Hines*, 3 Ohio St. 15; *Crow* v. *State*, 14 Mo. 268; *State* v. *Insurance Co.*, 12 La. An. 802.

In some other states, where laws similar to chapter 63 are held valid, no constitutional limits exist,—notably in South Carolina and Iowa. The law of South Carolina taxing express companies was enacted prior to the Iowa statute for the same purpose, yet the Iowa law is a better guide for us in determining the validity of our own enactment, first, on account of its similarity to our own statute, and, secondly, from the holding of the Iowa court regarding it. Our own law taxing express companies is probably compiled from the Iowa statute. It is interesting to learn what the court of Iowa, which encountered no stumbling-block in holding their law constitutional, thought of the propriety of such an enactment in other states whose constitutions require uniformity of taxation. In *U. S. Express Co.* v. *Ellison*, 28 Iowa 370, the court say,—" It must be borne in mind that we have not in this state, as they have in Wisconsin, a constitutional provision declaring that 'the rule of taxation shall be uniform;' nor, as in Ohio, declaring that 'laws shall be passed taxing by uniform rule all moneys, credits,' &c.; nor, as in Louisiana and California, 'that taxation shall be equal and uniform throughout the state;'—and hence the decisions in those states, in respect to the constitutionality·of certain taxing laws therein respectively, have no necessary bearing upon the question before us. And though we recognize the distinguished ability of those courts, and concede the correctness of their conclusions, yet they are not rules of decision applicable here, since they rest upon entirely different constitutional provisions."

By the constitution of Massachusetts, power is given " to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of and persons resident and estates lying within said commonwealth;" and the court of that state, in *Com.* v. *Bank*, 5 Allen 431, referring to this clause in discussing a bank tax, says,—" Viewed as a tax assessed under this clause, it would be contrary to its provisions, because it is not proportional on all persons and estates in the commonwealth, but is·assessed on a certain class selected by the legislature for the specific purpose of imposing a tax." See, also, *Lowell* v. *Hadley*, 8 Met. 191; *Morse* v. *Stocker*, 1 Allen 150; *Boston* v. *Shaw*, 1 Met. 130; *Goddard, Petitioner*, 16 Pick. 504. But the constitution of Massachusetts granted the further right " to impose and levy reasonable duties and excises upon any produce, goods, wares, and merchandise and commodities," and much of the tax assessed in that state was under this power.

II. The tax is not only not "proportional and reasonable," but it is not assessed upon inhabitants, residents, or estates.    "And while the public charges of government, or any part thereof, shall be assessed on polls and estates in the manner that has heretofore been practised, in order that such assessments may be made with equality there shall be a valuation of the estates within the state taken anew once in every five years at least, and as much oftener as the general court shall order." N. H. Const., part 2, art. 6.    There are two things only in this state which may be taxed, viz., polls and estates.    In designating upon what the public charges of government, "or any part thereof," shall be assessed, the rules of construction imply that everything not enumerated shall not be assessed.    Gross receipts cannot be deemed property.    There is no rule by which they may be valued. Even if income derived from "notes, bonds, and other securities" might be taxed—see *Opinion of the Justices*, 53 N. H. 634—there is at least some element in it by which a valuation can be made. If income from notes, bonds, and other securities can be deemed "estate," it does not follow that the gross receipts of business can be deemed income.

The fundamental theories of taxation in our constitution, besides the poll tax, are property and equality.    Twice we find it asserted therein that taxes shall be laid upon estates, and shall be proportional or equal.    Recognizing that equality of taxation must be based upon uniformity of valuation and uniformity of the methods of assessment, provision is made for periodical valuation of estates, in order that the paramount idea shall be perfectly wrought out in results.    Provisions so plainly limiting upon what the public charges of government "or any part thereof" shall be assessed; reasserting and redeclaring that such charges shall be borne equally, proportionally, reasonably; pointing out the method by which such equality can be attained, and making that one method mandatory upon the general court to the exclusion of all other theories or means of raising revenues adopted by many other states,—after having been so long lived under, acquiesced in, understood, and followed, ought not now to be open to any new construction.    Practice under our constitution is our common law. It is enough to say, that we have no taxation laws like this one. It is not necessary to suggest, that if the gross receipts of an express business are taxable in this way, the gross receipts of any other business are taxable in the same way; that if the gross receipts of one business only are taxable, then the gross receipts of any other business may be singled out for taxation.    To-day, a part of the public charges may fall upon the gross receipts of the expressmen; five years hence, this tax may be shifted to the manufacturers, because manufacturers would pay a vastly larger amount of revenue into the treasury if taxed upon gross receipts; and later, it may be placed upon some other class,—and so be

changed and increased without limit, until all the public charges are confined to the gross receipts of some one business to the exemption of all other property. True, the manufacturer is already assessed upon his property : so is the expressman. If it be double taxation in one case, so it is in the other.

Tested by all rules of taxation known to our constitution, this law, I repeat, violates all. It does not tax "estate;" it is not "proportional" nor "reasonable;" it is not based upon "valuation;" it destroys the theory of equality of taxation of all inhabitants, residents, and estates, not through the subtle medium of exemption, nor by reason of the varying standards of municipal assessments, but by deliberate legislative enactment. This law is of importance to the expressman; it is of vastly more importance to the "inhabitants" and "residents" of the state ;—for if it can be sustained, it must be upon some theory which commits to the will of the legislature the questions of who shall be taxed, and how much any person or class shall be assessed : in other words, the property of the minority is held at the mercy of the majority, under a constitution illuminated and inspired in every part with the idea of equality.

*The Attorney-General,* for the plaintiff. It is claimed that *c.* 63 of the Gen. Laws, under which the defendants are taxed, or are required to pay a license,—it makes but little difference by what name it is called,—" is in conflict with every provision of the constitution for the raising of revenue," and that there is but one mode of raising revenue under our constitution, to wit, that of taxes on polls and estate, and "making that one method mandatory upon the general court to the exclusion of all other theories." On the other hand, we hold that the constitution gives ample power and authority for the raising of revenue in the mode provided by this chapter, and that it expressly recognizes other modes of taxation than that of "polls and estate;"—in other words, the power of taxation, instead of being limited to two subjects, to wit, persons and property, may be constitutionally applied to at least three, to wit, persons, property, and business. Whether the license required, or the rate imposed by this chapter on express companies, falls within the express powers given by the constitution for the imposition and levying of "proportional and reasonable assessments, rates, and taxes" upon inhabitants and estate, or falls within some other provision, it is strictly constitutional. It is a tax imposed on the occupation, or business, or the privilege of carrying on this particular business ; and when a tax takes this form, it is usual to collect it through the medium of a license. Such taxes have always been imposed by every civilized government, and it is believed they exist, in some form or other, in nearly or quite every state of the Union, New Hampshire not excepted. The requirement of a license before engaging in a particular kind of business

is frequently resorted to by the U. S. government as one mode of raising revenue. *License Tax Cases,* 5 Wall. 472.

If this tax is unconstitutional, we do not see why every peddler's license, every itinerant merchant's license, and every other license which is now or ever has been required by the laws of this state to be taken out, are not also unconstitutional. They are taxes on business, or for the privilege of carrying on particular kinds of business, and do not come within what is claimed by the other side as the only and exclusive mode of raising revenue. It would seem, however, rather late in the day to raise a constitutional question over such kind of taxes. There probably are jurisdictions in this country, owing to some peculiarity in the phraseology of the organic law, where such taxes are not upheld; but generally this is one of the frequent modes which the legislative power, in its wide discretion in such matters, lays hold of for the purpose of raising revenue for the support and maintenance of the government. We think it is very clear that there is no constitutional inhibition in this state against raising revenue in this way, whenever the public good or the necessities of government may require it.

Art. 5, part 2, of the constitution of New Hampshire, provides as follows: "Full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions, and instructions    *    *    *    as they may judge for the benefit and welfare of this state, and for the governing and ordering thereof, and of the subjects of the same, for the necessary support and defence of the government thereof; *    *    *    and to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of and residents within the said state, and upon all estates within the same." This last clause, touching the imposition of " proportional and reasonable assessments, rates, and taxes," is the one usually referred to as the source from whence the taxing power of the state is derived. And we contend that the law in question is clearly warrantable under this particular clause. The language is broad enough to cover the taxation of every species of property, and all classes of persons, and every mode for the imposition of taxes. But whether this be so or not, the first clause in this article is applicable to the raising of revenue, and gives the legislature wider scope as to the methods it shall employ for that purpose. The power here given to assess, rate, and tax all the inhabitants and all the estates within the state, by no means excludes other modes of raising revenue, or prohibits the general court from passing other " wholesome and reasonable orders, laws, statutes, ordinances " which they may deem necessary for the support and defence of the government. These two clauses stand separate and distinct from each other, and are to be construed separately, each standing by itself. By them the legislature is clothed with authority,—

1st. To pass any reasonable and wholesome laws, statutes, and ordinances which it may deem necessary for the support of the government; and this covers the whole police power of the state;— and

2d. "To impose and levy proportional and reasonable assessments, rates, and taxes" upon persons and estates within the state. One mode, therefore, may be by taxing persons and estates, and another may be the taxing of business, occupations, and professions, whenever the legislature, in its sound discretion, may deem such taxes to be for the public good or for the necessities of the state. The law in question falls within the power thus given to make all wholesome and reasonable laws, statutes, and ordinances for the support of the government, even if it is not within the other clause of the constitution, which authorizes "proportional" assessments on inhabitants and estates. In Massachusetts, where the provisions of their constitution are very nearly like ours, laws like this are upheld as coming within another clause of their constitution similar in purport to this clause in our own. *Com.* v *People's, &c.,* 5 Allen 428.

If there could be any doubt as to the soundness of this construction, it is, as it seems to us, made perfectly plain by the article which follows in immediate connection. "Art. 6. And while the public charges of government, or any part thereof, shall be assessed on polls and estates in the manner that has heretofore been practised, in order that such assessments may be made with equality there shall be a valuation of the estates within the state taken anew once in every five years at least, and as much oftener as the general court shall order."

By the terms of this article—that "while the public charges of government, or any part thereof, shall be assessed on polls and estates"—the fact is distinctly recognized, that there might be other modes provided to meet the public charges of government, in whole or in part. It is clearly implied by this language that the legislature was not restricted to this one mode of taxation, or confined to these two subjects, "polls and estates," but that it would have the power to abandon this mode, either wholly or partially, and resort to some other; but as long as this mode of assessing polls and estates remained, and the charges of government, or any part of such charges, were met in that way, a valuation of all estates should be taken once in five years. The constitution thus clearly contemplates other modes of raising revenue than that of assessments on polls and estates, and by its very terms, as we contend, all other modes are not excluded, as the defendants claim. This, it seems to us, is the plain, reasonable, and common-sense interpretation of the constitution, and leaves the legislature, in the sovereign power which it wields, free to seek such new sources of revenue as the public good and the exigencies of the state might in its judgment require.

And in casting about to see where new sources of revenue could be found, for the purpose of equalizing the burdens of taxation, and relieving the agricultural and other interests which have notoriously borne more than their fair share, where would the legislature be more likely to look than to these comparatively new interests which have sprung up in the state, such as express and telegraph companies? They are protected by the laws; they share in all the benefits to be derived from good government; they have little tangible property that can be taxed; and many of them, notably these defendants, are drawing from the people very large incomes and heavy profits. Why should not the privilege they possess of carrying on this business be subject to taxation? Why should they not be required to contribute towards the support of the government, which affords them protection somewhat in proportion to the advantages which they derive from their business and the privileges they enjoy under the government? The farmer, with his real estate, his stock, and his personal property spread open to view; the merchant, with his stock in trade,—no matter whether either of them derives much or little income, or none at all, from his business,—cannot escape taxation to the full amount of their property; but the express company, with nothing tangible except a few horses and carriages and iron safes, though deriving an income from their business more than that of hundreds of farmers and merchants combined, cannot, it is contended, be taxed on their business, because such a tax would be unconstitutional. Under a constitution which, it is said, looks to a perfect equality of taxation, what equality is there in this? We do not believe, however, that the taxing power in the state is thus cribbed, cabined, and confined by the constitution, but that, under authority given by that instrument to pass "all manner of wholesome laws for the support of the government," the legislature not only has the right to enact laws such as we are now considering, but is in duty bound to exercise that right, to the end that the burdens of taxation shall be more equally distributed by removing a portion of them from the shoulders of those who have been loaded too heavily, and placing it upon those who ought to bear a just share but have hitherto escaped any part of the public burden.

Although it is not so in theory, yet practically the express companies, or most of them in this state and throughout the country, are monopolies. What chance is there for competition or a rival line over the railroads now occupied by this mammoth company? It may be said that anybody may run an express, and that the railroads would be bound to run any cars that might be placed upon their tracks. Theoretically, as we have said, this may be true; but although the business is known to be lucrative, out of which fortunes are made, and which would naturally invite competition, such is the close connection between the express company and the several railroads over which they run, that ingenuity has

as yet discovered no way by which a competing line can be established and stand a fair chance of success. What is true of this line is true of others, though there may be one or two exceptions. The point, therefore, which we make is, that the business of this defendant company is, to say the least, in the nature of a monopoly, and that enterprises of this character are peculiarly within the purview of legislative regulation and taxation, whether the same be for the purpose of revenue, or by virtue of the police power of the state. Cool. Tax. 173, 403.

It is claimed by counsel that there is no constitutional power to impose a tax on business; but the practice under the constitution, to tax certain kinds of business for so many years, is the best practical commentary as to the meaning and interpretation of the constitution, as understood and acted upon by those contemporaneous with the framers of that instrument. To quote the language of the defendants' brief, which we adopt,—" Practice under our constitution is our common law." This practice we have already pointed out in *B., C. & M. R. R.* v. *State* (60 N. H. 87, 91, 92); and in further elucidation of our position, we quote from the able report of the tax commissioners made to the house of representatives in April, 1878: " But it is said that it has never been the practice of the state to tax a business or its income. This is an error. The tax levied for more than thirty years under the present constitution, on the income of mills, wharves, and ferries, was a tax on business, the rate being one twelfth of the net receipts. The constitutionality of that tax was never questioned. The tax on 'faculty,' by the act of 1784, was based on the same constitutional provision as exists to-day." The authorities in support of the view we entertain are numerous, and, it seems to us, conclusive. " The power of taxing is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the government acts upon its constituents. This is, in general, a sufficient security against erroneous and oppressive taxation." *M'Culloch* v. *Maryland*, 4 Wheat. 428. " The power of taxation is necessarily limited to subjects within the jurisdiction of the state. These subjects are property, persons, and business. Whatever form taxation may assume, whether as duties, imposts, excises, or licenses, it must relate to one of these subjects. The taxation may be exercised in a great variety of ways. It may touch property in its natural condition, in its manufactured form, and in its various transmutations; and the amount may be determined by the value of the property, or its use, or its capacity, or its productiveness. It may touch business in professions, in commerce, in manufactures, and in transportation." *Railroad* v. *Pennsylvania*, 15 Wall. 319; *Catlin* v. *Hull*, 21 Vt.

152; *Grim* v. *School-District,* 57 Penn. St. 433; *Duer* v. *Small,* 4 Blatch. 263; *Pullen* v. *Wake County,* 66 N. C. 361.

It is said by the defendants, that "to be proportional" it is not enough that a tax is levied upon one entire class of citizens, but it should be upon all classes. No authority, however, is given in support of this proposition, and exactly the reverse of it is laid down by good authority. "A law or ordinance, imposing a tax which clearly embraces all engaged in the business or calling taxed, fulfils a constitutional provision requiring taxation to be equal and uniform." Hill. Tax. 30, *s.* 58, and auths. "It has already been stated that inequality does not necessarily follow the restricting taxation to a few subjects only, or to a single subject. A license tax cannot be deemed unequal because reaching one occupation only, if it reach all who follow that. Let it reach all of a class, either of persons or things, it matters not whether those included in it be one or many, or whether they reside in any particular locality, or are scattered all over the state. It would only be when individuals of the class were singled out for exemption that the inequality would be manifest." *Durach's Appeal,* 62 Penn. St. 491–494; Cool. Tax. 128. "In general, indirect taxes, imposed not merely for revenue, but in restraint of a particular business or calling, or as a license on particular pursuits, or as mere police regulations, do not come within a constitutional requirement that the rate of assessment and taxation shall be uniform and equal." Hill. Tax. 30, *s.* 60; *Bright* v. *McCullough,* 27 Ind. 223. "It is generally held that a tax on occupations is constitutional. Thus a tax on the occupation of retailing goods and spirituous liquors, and of keeping a ten-pin alley." Hill. Tax. 161 and auths. Under a law providing "for taxing all property in this state according to its true value," capital invested in the business of purchasing hogs. and slaughtering and packing pork for sale or transportation, is subject to taxation. *Jackson* v. *State,* 15 Ohio 652. "An act imposing a special tax on wholesale dealers in malt liquors is not in violation of the constitutional requirement that taxation on property shall be *ad valorem* only, and uniform on all species of property taxed." "It is a tax, not on the property, but on the business, or occupation, or privilege." Hill. Tax. 161. "The government may levy a tax on every species of property within its jurisdiction; or, on the other hand, it may select any particular species of property, and tax that only. The same is true of occupations : government may tax one, or it may tax all. There is no restriction on its power in this regard, unless one is expressly imposed by the constitution." Cool. Tax. 384; *Butler's Appeal,* 73 Penn. St. 448–451. "The methods on which business shall be taxed are also in the legislative discretion. The taxes which are most customary are,—1. On the privilege of carrying on the business; 2. On the amount of business done; 3. On the gross profits of the business; 4. On the net profits, or profits divided. But the

tax may be measured by other standards prescribed for the purpose, as well as these." Cool. Tax. 385.

"A tax on the privilege of following any particular employment is usually confined to those which in some particular are exceptional, either because supposed to be specially profitable, or because they require special regulations, or because the privilege is in the nature of a franchise, or because they supply a general demand, so that the burden imposed will be generally distributed." Cool. Tax. 385; *License Tax Cases*, 5 Wall. 472. " But no employment is absolutely exempt from the liability to be taxed. The necessities of the government may require that the lowest employment, as well as the most lucrative, shall contribute to its support, and if any is exempted motives of policy will govern the discrimination." Cool. Tax. 385. "When the tax takes the form of a tax on the privilege, convenience in collection will commonly dictate the requirement of a license, and the person taxed will be compelled to pay the tax as a condition to the right to carry on the business at all." Cool. Tax. 385; *License Tax Cases*, 5 Wall. 472; *Lucas* v. *Lottery Commissioners*, 11 Gill & J. 490. If express companies do not come emphatically within the rules and principles here laid down, it would be difficult to find a subject for taxation which would. Mr. Cooley, in his work on taxation, enumerates some of the various kinds of business which have in different jurisdictions been specially taxed,—to wit, bankers, carriers of goods and persons, practitioners of law and medicine, auctioneers and commission dealers, merchants, peddlers, manufacturers of and dealers in liquors, theatrical exhibitions and shows, hackmen, draymen, manufactures, offices, corporations, etc. " There are various methods of taxing bankers. * * * But taxes are also imposed which are measured by the business done, the deposits received, the profits made," etc. Cool. Tax. 388, and auths. cited. Merchants are a class of persons often selected for taxation. " The fact that they pay taxes on their stock in trade as property, does not preclude their occupation from being specially taxed." Cool. Tax. 389. In *Lott* v. *Ross*, 38 Ala. 156, it was held that " a tax on the gross amount of sales is not a property tax, but an occupation or privilege tax, the amount being regulated by the extent to which the privilege has been enjoyed." Cool. Tax. 389.

We are aware that the construction we have given to the first clause of art. 5, part 2, of the constitution, is not in harmony with the opinion of the judges in the 4th volume of our reports; but, notwithstanding the high authority of Judge *Richardson*, we are compelled to dissent from the construction he puts upon this article, although it may seem quite presumptuous to do so. The law in question can be sustained, we think, even under his construction; for the law requiring this license, in view of all the facts, and of the propriety and the necessity which exist for bringing out, whenever it can be done, " new sources of revenue " to meet

the growing wants of the state, must, it seems to us, be regarded as a " reasonable " rate or tax; and, in the light of the authorities, and in the light of reason as well, it cannot be held otherwise than " proportional " in the sense intended by the constitution, inasmuch as it taxes alike all of the particular class to which it applies. What is a reasonable tax is defined, by this same opinion, to be a matter within the discretion of the legislature, and that within the limits of this discretion the authority of the legislature is supreme, so that the discretion exercised be not repugnant to reason.

Judge *Richardson* says,—" The grant of full power to make all manner of wholesome and reasonable statutes is broad enough to give the power of imposing and levying taxes.    But this grant of power is limited and explained by the subsequent clause which we have recited on the subject of taxation."    It seems to us, with very great deference, that it is an extremely arbitrary view to say that the first clause is "limited and explained" by the other, or that the power would be " deduced " from the " general terms " of the first clause to impose different taxes, or different modes of taxation, from those prescribed by the other.    If the very learned judge had only in his mind so much of the language of the constitution as he has quoted, it is not strange that he arrived at this result.    He leaves out altogether the important words " for the support of the government."    These words are common to both clauses.    The terms are as express in the one as in the other.    In the one, power is expressly given to make " all manner of reasonable laws, statutes, and ordinances, from time to time,    *    *    for the support and defence of the government;" in the other, "to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants and estates, for the support and defence of the government," thereby granting the power to do, by different methods, the same thing, to wit, raise revenue for the support and defence of the state.    If this narrow view is adopted, we do not see where the power comes from to require licenses of any kind for the purpose of adding to the revenues of the state.    It seems singular that the wise and able men who framed our state constitution should so limit and tie up the hands of the legislature, that, no matter what the emergency or the propriety might be, it could only raise revenue for the support of the government in one particular way; that they should ignore every other mode of raising revenue which had been practised from time immemorial; that they should fail to comprehend that the state would make advances in its material prosperity and in the development of its resources, and therefore that other modes might be required to replenish the coffers of the state treasury, but left, as the embodiment of their wisdom, only the right in the legislature to raise revenue by the taxation of polls and estates, and to exercise their discretion only so far as to judge whether such laws were " proportional " and " reasonable."    We do not think that this interpretation ought to stand.

Equality of taxation seems to be the war-cry under which parties who are now reached by the new system of taxation hope still to escape their just share of the public burdens. Perfectly equal taxation is beautiful in theory, but impossible in practice. With this for a premise, there is not a tax in New Hampshire that could stand a moment, and which could not, by some nicely spun argument, be demonstrated to be grossly unequal, unjust, and unconstitutional. The framers of our constitution could never have expected that perfect equality of taxation under its provision would be attained; and the practice under it has shown it to be impracticable. In spite of all that has or can be said against this law and others, on the ground of inequality, we respectfully submit, that, with these enactments made for the purpose of reaching new sources of revenue, our system of taxation is much more just and equal than it was without them. Large interests are now required to pay taxes, which before wholly escaped, and other interests and classes are correspondingly relieved. This is an approach toward that equality of taxation which the defendants see in their visions, and which all so much desire.

"Perfect equality in the assessment of taxes is unattainable. Approximation to it is all that can be had." *Commonwealth* v. *Savings Bank*, 5 Allen 428; *Lowell* v. *Oliver*, 8 Allen 247; *Tappan* v. *Bank*, 19 Wall. 490; Cool. Tax. 127. "Perfect equal taxation will remain an unattainable good, as long as laws and government and man are imperfect." *Grim* v. *School District*, 57 Penn. St. 433; *People* v. *Worthington*, 21 Ill. 171; *Durach's Appeal*, 62 Penn. St. 491. "There is no imperative requirement that taxation shall be equal. If there were, the operations of government must come to a stop. * * * Theoretically, tax laws should be framed with a view to apportioning the burdens of government so that each person enjoying government protection shall be required to contribute so much as is his reasonable proportion, and no more. The tax law that comes nearest to accomplishing this is, in theory, the most perfect. * * * It being thus manifest that there are serious and often insurmountable difficulties in the way of equal taxation, it remains to be seen what is the rule of law where in the particular case the inequality can be pointed out and demonstrated. On this subject certain points have already been covered. The legislature must decide when and how and for what public purposes a tax shall be levied, and must select the subjects of taxation. This is legislative, and the legislative conclusion in the premises must be accepted as proper and final. It follows, that a tax cannot be attacked on averment and proof that some other tax for the same purpose would have been more just and more equal. An excise tax on one kind of business only is not illegal for the discrimination; it is always to be conclusively presumed that the legislature found good and controlling reasons impelling the action it has taken, and that, in view of all the circumstances which were known

to its members, the tax which has been provided for is reasonable."
Cool. Tax. 124, 125; *De Camp* v. *Eveland*, 19 Barb. 81. "It is the
theory of a republican government, that taxes shall be laid equally
in proportion to the nature of property, and when collected shall
be applied only to purposes in which the tax-payers shall have an
equal interest. But this is impossible even in the simplest state of
society, and becomes more and more difficult in proportion as a
higher civilization diversifies the characters, circumstances, and the
pursuits of our people. 'A just and perfect system of taxation,'
says Chancellor *Kent*, 'is yet a desideratum in civil government.'
(2 Com. 332.) No county or municipal tax ever came up to the
theory, and the taxes now levied by the state are a grievous vio-
lation of it. The improvements made by the commonwealth added
largely to the fortunes of some, to others they did no service, and
some were injured by them. Still all are compelled to pay for
them. It is not, therefore, every inequality of burden or benefit—
not every disproportion between the sum which the citizen pays,
and the interest which he, as an individual, has in the purpose to
which it is applied—that can make a tax law void. I am of opin-
ion, with the supreme court of Kentucky (9 B. Monroe 345),
'that a tax law must be considered valid, unless it be for a pur-
pose in which the community taxed has palpably no interest, where
it is apparent that a burden is imposed for the benefit of others,
and where it would be so pronounced at the first blush.'" *Black*,
C. J., in *Sharpless* v. *Philadelphia*, 21 Penn. St. 147, 168.

If the court should be of the opinion that the law in question
comes properly within the taxing power of the state, it has no
power to go further and determine whether it has been discreetly
used or not. That is a matter wholly within the discretion of the
legislature, and is for them and them alone to determine. Hill.
Tax. 5, 24, 33, and auths. cited; *Bank* v. *New York City*, 2 Black
631; 4 N. H. 570; Cool. Tax. 125, and auths. cited.

STANLEY, J. This case requires us to decide upon the consti-
tutionality of *c.* 63, Gen. Laws. Whether, under any circumstan-
ces, the statute in question could be regarded as an exercise of
the police power, we need not inquire. It is obvious it was not
so intended or understood, either by the tax commissioners who
reported it, or the legislature by which it was enacted, or the com-
missioners under whose direction it was incorporated with the
statutes in the volume of the General Laws. The report of the
tax commissioners affords abundant evidence of their understanding
that it was a statute solely for raising revenue. They speak of
taxes to be raised from "express companies" as a new source of
revenue, as one of the subjects of taxation. Report of Tax Com.
23, 24, 25. The title of the bill, as reported by them, was
"An act to tax express corporations, companies, or persons carry-
ing on express business in this state;" and the bill itself, as

enacted, is identical with that reported by the commissioners, with the exception that, as enacted, there was an additional section providing for the collection of the tax, and "license" was substituted for "tax" wherever that word occurred in the bill as reported, as though the name by which the imposition was called would determine its nature. In the General Laws it is placed under the general title "Of taxation," and the title of this particular act is "Taxation or the licensing of express companies and express men." The word "license" may have been substituted under the impression that, as an act imposing a tax, it could not be defended; and other reasons, not now necessary to be mentioned, may have led to the change;—but whatever may have been the object, and without considering the title of the act, either as reported or passed, or its particular title and location in the General Laws, in the light of all the surrounding circumstances, and having in mind the provisions of the act, the character of the business upon which it was designed to operate, and the nature, application, and extent of the police power, it can be considered in no other light than that of a statute the object of which is to raise revenue by taxation; and the question before us must be determined on this view of its scope and object.

In considering this case, we recognize the doctrine, so often expressed, that we have nothing to do with the propriety, expediency, or policy of any law; that these considerations concern the legislature, and not us; that our sole duty, when the validity of any statute is challenged, is to ascertain and declare whether it conflicts with the constitution as the paramount law, leaving all other considerations with the legislature and people, where they of right belong. The question is, Does the act in question conflict with the provision of the constitution on the subject of taxation and raising of revenue?—and on this question it is incumbent on the plaintiffs to show under what provision of that instrument it can be sustained. *Savings-Bank* v. *Nashua*, 46 N. H. 389, 392.

The only provision of the constitution in which the power of taxation is given in express terms is found in article 5, in which it is declared that "full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions, and instructions, either with penalties or without, so as the same be not repugnant or contrary to this constitution, as they may judge for the benefit and welfare of this state, and for the governing and ordering thereof, and of the subjects of the same for the necessary support and defence of the government thereof   *   *   *; and to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants and residents within the said state, and upon the estates within the same, to be issued and disposed of by warrant under the hand of the governor of this state for the time being,

with the advice and consent of the council, for the public service, in the necessary defence and support of the government of this state, and the protection and preservation of the subjects thereof, according to such acts as are or shall be in force within the same."

It is claimed that under this provision the legislature is vested with power to pass all manner of wholesome orders, laws, and statutes for the necessary support and defence of the government, and with the additional power to impose and levy proportional and reasonable taxes; that these provisions are separate and distinct; and that if *c.* 63 cannot be upheld under the latter clause, it may under the former. If this position can be sustained, the latter provision was superfluous: there was no occasion for it. But it may well be claimed, that if the first clause can be construed as authorizing the raising of revenue for any purpose or under any circumstances, it is modified and restricted by the last clause. The general power is subject to the subsequent limitation. It must not be forgotten that the constitution enforces the idea that the sovereignty is in the people, and that all the power not expressly delegated to the legislature was reserved to the people. The provisions of the constitution must be regarded in the light of a grant to the legislature, and as conferring no power except what is expressly granted, or is indispensable to the exercise and enjoyment of those powers which are expressly granted. While the power of the legislature to raise a revenue for the support and defence of the government is absolute, the way in which it may be exercised is specifically set forth, and the method designated must be followed. The rule, that the general intent appearing shall control the particular intent, must sometimes give way, and effect be given to a particular intent plainly expressed in one part of the constitution, though apparently opposed to a general intent deduced from other parts. *Warren* v. *Shuman*, 5 Tex. 441; *Quick* v. *White-Water*, 7 Ind. 570; Cool. Const. Lim. 58.

The question as to the construction of article 5, so far as it relates to the subject of taxation, was considered by the court in the opinion in 4 N. H. 567; and there was an express decision that the power to levy taxes was based upon and controlled by that clause of the article which confers upon the legislature the power to impose and levy proportional and reasonable assessments, rates, and taxes. It was as distinctly held, that the power to pass all manner of wholesome statutes did not confer the power to impose taxes, except as limited and controlled by the clause which requires that taxes shall be proportional and reasonable. This construction of this provision of the constitution has stood unchallenged more than fifty years, during which period two conventions have been held, and no attempt made in either to modify or change it; and this fact clearly indicates that the construction put upon it by the justices in the opinion cited was in accord with the views of those

conventions, and the people whom they represented. The provisions of article 5 of the present constitution are identical with those on the same subject in the constitutions of 1783 and 1792. In the light of these facts, and considering that the justices who signed the opinion in 4 N. H. were contemporary with many of the framers of the constitution and must have understood their views, it is not easy to avoid the conclusion that the only power conferred upon the legislature to raise money by taxation is found in the last clause of article 5, regulated, limited, and explained by other provisions of that instrument.

In article 12 of the bill of rights, it is declared that "every member of the community has a right to be protected by it in the enjoyment of his life, liberty, and property. He is therefore bound to contribute his share in the expense of such protection, and to yield his personal service, when necessary, or an equivalent." In article 6 of the constitution the doctrine of the equality of taxation is affirmed, and measures are provided by which it may be ensured. These provisions establish equality and justice as the basis of all constitutional taxation.

While the convention which framed and the people who adopted the constitution recognized the absolute necessity of taxation for the support and defence of the government, and in broad and comprehensive terms conferred the power on the legislature to dispose of the sums raised, they did not forget that the power to tax was a delicate and difficult one; that it was always regarded with jealousy by those on whom it was to be exercised; and it was therefore declared in the bill of rights (article 28), "that no subsidy, charge, tax, impost, or duty shall be established, fixed, laid, or levied, under any pretext whatsoever, without the consent of the people, or their representatives in the legislature, or authority derived from that body." This power, inherent in the people, was by them delegated to the general court, subject to the condition that all taxes imposed should be proportional and reasonable upon all the inhabitants of and residents within the state, and upon all the estates within the same. While they granted the power in general terms, they qualified the manner of its execution, and determined the subjects upon which it should operate. It was confined to persons and estates. No other subjects or species of property were recognized as taxable. This was a restraint upon the power of the legislature to impose the taxes. *Bank of Commerce* v. *N. Y. City,* 2 Black 620.

If, then, equality and justice is the basis of all constitutional taxation, a statute founded on any other principle cannot be upheld. It is true that absolute equality of taxation cannot in all cases, perhaps not in any case, be attained; but if the inequality results from the inherent difficulty in applying the law, and not from the law itself, we cannot declare the law unconstitutional, and arrest the course of legislation. "The essential characteristics

of any system of taxation, properly so called, are certainly equality and universality. All the persons and property within a state, district, city, or other fraction of territory having a local sovereignty for the purpose of taxation, should, as a general rule, constitute the basis of taxation." *State* v. *Charleston*, 12 Rich. 702, 732; *O'Neal* v. *Bridge Co.*, 18 Md. 1. "The principle of just equality is therefore the governing one by which the validity of every tax levied by the legislature is to be determined. This equality can be secured only by uniformity in levying the tax, and a periodical valuation of the estate of every citizen." Black. Tax Titles 6. "It is not sufficient that no tax be imposed on the citizens, but by their representatives in the legislature. The citizens are entitled to require that the legislature itself shall cause all public taxation to be fair and equal in proportion to the value of property, so that no one species of property may be unequally or unduly assessed." 2 Kent Com. 331.

But this general principle of equality, which, independent of any constitutional provision, underlies and forms the basis of all taxation, is enforced here by the provision of the constitution that requires that "all assessments, rates, and taxes shall be proportional and reasonable." It is not left to the discretion of the general court to determine what is equal and reasonable, and to impose such as they may consider equal, but any other than equal and reasonable taxes, rates, and assessments are prohibited; and the equality intended is, "that the same tax shall be levied on the same amount of property in every part of the state, so that each man's taxable property shall bear its due proportion of the tax according to its value." 4 N. H. 568. Not only does the constitution require that all assessments, rates, and taxes shall be proportional or equal, but that they shall also be reasonable. This word is here used as having the same meaning as just, and the sense of the clause is, that taxes shall be laid not merely proportionally, but in due proportion, so that each individual's just share and no more shall fall upon him. This is the sense in which it was understood in 1791; for in the act of Feb. 8, 1791, the language used was, that the selectmen and assessors should assess the polls and estates within their respective towns, according to the rules and directions of law, their just and equal proportion of all sums of money granted by the general court. 4 N. H. 569. The definition of "reasonable" is apparent when we recall the declaration in the bill of rights that every person is bound to contribute his just share to the protection of life, liberty, and property.

In considering the constitutional provisions on the subject of taxation, it must not be forgotten that the constitution is not so much a grant of specific powers as a limitation on the exercise of general powers. "The legislative power extends to every proper object of legislation, and is only limited by the constitution, and by the fundamental principles of all government and the inalien-

able rights of man. *Dart. Coll.* v. *Woodward*, 1 N. H. 111, 114; *Concord R. R.* v. *Greely*, 17 N. H. 47, 54; *Bank of Commerce* v. *N. Y. City*, 2 Black 620. The doctrine announced in the opinion in 4 N. H. 565 goes no further than to declare that the true constitutional idea and basis of all taxation is equality and justice; and that each person and his estate shall bear his proportional and reasonable share of the public burdens. This view was affirmed in *Smith* v. *Burley*, 9 N. H. 423, 427; *Savings Bank* v. *Nashua*, 46 N. H. 389, 398; *Smith* v. *Exeter*, 37 N. H. 556; *Savings Bank* v. *Portsmouth*, 52 N. H. 17, 26, 29; *Morrison* v. *Manchester*, 58 N. H. 538, 549; *Edes* v. *Boardman*, 58 N. H. 580, 587; *Bank* v. *Concord*, 59 N. H. 75; *Bartlett* v. *Carter*, 59 N. H. 105; *Bowles* v. *Landaff*, 59 N. H. 164, 190, 193, 195; *Gould* v. *Raymond*, 59 N. H. 260, 275; *Berry* v. *Windham*, 59 N. H. 288; *Robinson* v. *Dover*, 59 N. H. 521; *Railroad* v. *State*, 60 N. H. 87, 94.

But it is urged that the contemporaneous and practical construction of the constitution is in harmony with the statute under consideration. It is said that for many years, under the present constitution, there was a tax of one twelfth of the net receipts of the income of mills, wharves, and ferries, and the constitutionality of that tax was never questioned. It is true, that Feb. 7, 1789, such a statute was enacted, in which it was also provided that other property should be taxed at a given rate; but this, as the title and preamble and the act itself show, was only a way of arriving at the valuation of the property, and the doctrine of the equality and justice of taxation was not overlooked. The title of the act is as follows: "An act to establish an equitable method of making rates and taxes, and determining who shall be legal voters in town and parish affairs, and for repealing certain acts hereinafter mentioned." The preamble recites, that "Whereas it is necessary that there should be an equitable rule established by law for making rates and taxes within this state so that every person may be compelled to pay in proportion to his or her estate, and also for ascertaining who shall be legal voters in town and parish meetings."

The act provides that henceforward all public taxes shall be made and assessed in proportion to the amount of each person's poll and ratable estate, which shall be as follows: viz., "All male polls from eighteen to seventy shall be estimated at ten shillings each; all wharves and ferries shall be estimated at one twelfth part of their net yearly income." It enumerates all the different kinds of property subject to taxation, and the rate of each kind. This act, with the title and preamble, may be found in a volume entitled "The Perpetual Laws of the State of New Hampshire, from July, 1776, to Dec., 1788." It was published at Portsmouth in 1789. It was continued in force, without change in the manner, but with slight changes in the rate and with the addition of other kinds of property, until 1833, when the present method of deter-

mining the valuation for the purpose of taxation was adopted.   This act falls far short of sustaining the view for which it is invoked. It is rather an argument against that view, for it shows, beyond question. that the understanding at that time was that taxes should be proportional and equal on all kinds of property, according to its valuation.   Moreover, it only provided for a tax on property capable of valuation.   It did not include business, or the receipts of business.   Ferries, wharves, and mills are tangible ; and their value can be estimated in different ways, either by taking their income, or the market or salable value, as the basis.

The provisions of our constitution on this subject will be found, on examination, identical with those of the Massachusetts constitution, from which they were copied ; and the courts there have on several occasions given a construction to them which, from the ability and high character of the court, and the thoroughness with which the subject has been considered, entitle their adjudications to great weight, if they are not authority binding upon us.

In their constitution there is a provision authorizing " the general court to impose and levy reasonable duties and excises upon any produce, goods, wares, merchandise, and commodities whatsoever, brought into, produced, manufactured, or being within the same."   Mass. Con., art. 4.   The fact that our constitution was copied from that of Massachusetts, and that the foregoing provision of that constitution was omitted from ours, is significant, since it must have been intentional.   The constitution of Massachusetts was adopted in 1780.   The first constitution of this state was adopted by the convention in June, 1783, and ratified and adopted by the people, October 31, 1783.   These facts warrant the inference that the convention which framed and the people who ratified it did not intend to confer upon the legislature the power to raise revenue in any other way than by an equal and just assessment upon persons and estates ; and the previous history of the province, and the contests between the people on the one side and the royal authorities and the government of Massachusetts on the other, tend to show the jealousy with which the power of taxation was regarded.   It may have been thought that direct taxation upon persons and estates would be more likely to encourage economy and frugality in the administration of the government, which it declares " are among the indispensable requisites for the preservation of liberty and good government."   Bill of Rights, art. 38.   But whatever was the reason for the omission, it could not have been accidental.

These provisions of the Massachusetts constitution were first considered and construed in *Portland Bank* v. *Apthorp*, 12 Mass. 252.   The statute then under consideration was one requiring "all banks within the commonwealth to pay to the treasurer of the commonwealth, for the use of the same, a tax of one half of one per cent. on the amount of capital stock actually paid in."   The

court, *Parker*, C. J., say, " Under the first branch of this power, viz., that of imposing and levying rates and taxes, the requisition upon the banks cannot be justified, for those taxes must be upon property and upon all the inhabitants of, and persons resident and estates lying within, the commonwealth. The exercise of this power requires an estimate or valuation of all property in the commonwealth, and then an assessment upon each individual according to his proportion of that property. To select any individual or company, or any specific article of property, by themselves, would be a violation of this provision of the constitution."

The subject was again considered in *Com.* v. *Savings Bank*, 5 Allen 428, on a bill in equity to enforce the payment of three fourths of one per cent. on the deposits in the defendant bank; and the court, *Bigelow*, C. J., say, " While the power to impose taxes is an inherent and essential power of government, and is conferred on the legislature, yet it is a power to be exercised carefully, and within the exact limits prescribed in that clause of the constitution which creates and defines it." In speaking of the validity of the tax, he says, " Viewed as a tax [assessed under the clause in their constitution similar to our own], it would be contrary to its provisions, because it is not proportional on all persons and estates in the commonwealth, but is assessed on a certain class selected by the legislature for the specific purpose of imposing a tax." The question again arose, in *Lowell* v. *Oliver*, 8 Allen 247 ; and the court, by *Bigelow*, C. J., say (page 253), " The power of the legislature as to the imposition of taxes is clearly defined, but the delegation of authority, although ample, is subject to three restrictions: first, that the taxes imposed must be proportional and reasonable ; second, that they must be laid according to a valuation on all estates in the commonwealth, made within the current decade [in this state every five years] ; and third, that they shall be levied for objects which are within the general purposes enumerated in the clause of the constitution, for which public money may properly be expended."

In *Oliver* v. *Washington Mills*, 11 Allen 268, the validity of an act of the legislature, requiring every dividend-paying corporation, organized under a charter or general laws, paying dividends in stock, scrip, or money, to reserve one fifteenth of each and every dividend, and pay the same as a tax or excise to the treasurer of the commonwealth within ten days after the dividend is payable, was considered. The court say, " If it is to be regarded as a tax, it is not within the provisions of the constitution as proportional and reasonable." In defining what is meant by a tax under this clause of the constitution, they say, " It is a charge apportioned either among the whole people of the state, or those residing within certain districts, municipalities, or sections. It is required to be imposed so that if levied for the public charges of government it shall be shared according to the estate, real and personal,

which each person may possess ; or, if raised to defray the cost of some local improvement of a public nature, it shall be borne by those who will receive some special and peculiar benefit or advantage which an expenditure for a public object may cause to those on whom the tax is assessed." " The power of the legislature to impose taxes is beyond dispute. It is conferred in express terms, but the limitation of the power is as express as the delegation of it. While on the one hand the authority is conferred in broad and comprehensive terms, so on the other the principle on which it is to be exercised is clearly defined." *Com.* v. *Hamilton Manufacturing Co.*, 12 Allen 298, was an action to recover a tax on the value of the defendants' property in excess of their real estate and machinery; and the court held that it could not be justified as a tax, because it was not laid according to any rule of proportion, and it was therefore contrary to the provisions of the constitution requiring all taxes to be proportional and reasonable. And the same view was expressed in *Com.* v. *Savings Inst.*, 12 Allen 312, which was an action to recover a tax under the act of 1862, imposing a tax of one per cent. on the average deposits in savings-banks. These views were reaffirmed in *Com.* v. *Lowell Gas-Light Co.*, 12 Allen 75 ; *Ins. Co.* v. *Loud*, 99 Mass. 146 ; *Prov. Inst.* v. *Boston*, 101 Mass. 575.

It will be seen that the construction of this clause of our constitution, for which the defendants contend, is sustained by the unbroken current of Massachusetts decisions from 1815 to the present time.

But if it is claimed, against the force of the opinion in 4 N. H. and the Massachusetts decisions, that the power of taxation is conferred by article 2 of our constitution, which declares that " the supreme legislative power within this state shall be vested in the senate and house of representatives, each of which shall have a negative on the other," and that this provision is not contained in the constitution of Massachusetts, it may be urged, in reply, that, granting that the power of taxation is conferred by article 2, it is limited and restricted by the provisions of articles 4 and 5, which follow. Those articles define, with great particularity, the powers which may be exercised by the general court, and would seem to confer all the power required by that body to enable it " to provide for the necessary defence and support of the government, and the protection and preservation of the subjects thereof." If articles 4 and 5 were not understood and intended as restrictions and limitations upon the general power conferred by article 2, it is difficult to understand why they were inserted. They were unnecessary, for they do not enlarge the power of the general court as conferred by article 2, and unless they may be treated as restrictions they are useless. If they are restrictions, it might be suggested that the whole power of taxation is contained in that part of article 5 which authorizes the levy of " proportional and reasonable taxes on

all the inhabitants and residents of and estates within the state," and that they restrict the power not only to the manner of the levy, but to the subjects upon which it can be exercised, viz., persons and estates. If this view is correct, it might well be claimed that the objections to the force to be given to the Massachusetts cases could not be sustained.

In the opinion of the justices, 4 N. H. 566, the court, after referring to article 2, and quoting from article 6 the grant of legislative power, say,—" Here the power granted is a power to make all manner of laws and statutes which are wholesome, reasonable, and not repugnant to the constitution. It is, in its nature, a limited and restricted power. But the constitution has not left the power to impose and levy taxes to be exercised under this grant of power, limited and restricted as it is, but has made a special provision on the subject of taxation." After quoting the provision of the constitution which requires that taxes shall be proportional and reasonable, the opinion proceeds : "It is a sound rule, that the different parts of an instrument shall be so expounded as to give meaning to every part, if it be possible. It is not uncommon to find a grant in indefinite general terms, limited and explained by a subsequent enumeration of particulars; and when such enumeration is clearly and explicitly made, it must be construed to control the general terms, for otherwise it will be merely idle and nugatory. Thus in our constitution it is declared, in the first place, that the supreme legislative power shall be vested in two bodies, who are to be styled the general court. But these general terms are subsequently explained and limited by the clause which gives to the general court full power to make, ordain, and establish all manner of wholesome and reasonable orders, laws, statutes, etc., not repugnant to the constitution; for if this clause be not construed to limit and control the other, it is idle and useless. So the grant of full power to make all manner of wholesome and reasonable statutes is broad enough to give the power of imposing and levying taxes. But this grant of power is limited and explained by the subsequent clause, which we have recited, on the subject of taxation. The constitution having, in express terms, given the power to impose and levy proportional and reasonable taxes, it is wholly inadmissible to deduce from any more general terms, used in other parts of the instrument, the power to impose and levy any other than proportional and reasonable taxes: because, if the clause on the subject of taxation be not construed to explain and limit the more general terms used, it will be altogether idle. The constitutional right of the legislature to impose taxes cannot, then, by any sound rule of construction, be held to extend further than to impose proportional and reasonable taxes."

It may also be urged, as is said in *Oliver* v. *Washington Mills*, *supra*, that " in a constitution, the great purpose of which was to

define and limit the powers of government, it cannot be supposed
that the power to lay and assess taxes would be granted to the
legislature without any obligatory restraint on its exercise.    No
power is capable of greater abuse, or can be made more oppressive
and odious in practice.    Of this the framers of the constitution
and their contemporaries had had abundant experience and
knowledge.    Nor can we doubt that by the use of words in the
constitution the natural import of which is to put a limit on the
exercise of this power, they intended them to have that operation
and meaning."

In order, however, that the tax should be proportional, it is not
necessary that the rate of taxation should be the same in every
town or taxing district in the state.    This would be practically
impossible, for each town determines for itself what amount must
be raised to meet its ordinary expenses, and the amount of
property and the persons from whom it is to be raised are different
in different towns and taxing districts : but it is required that the
rate shall be the same throughout the taxing district;—that is, if
the tax is for the general purposes of the state, the rate should be
the same throughout the state ; if for the county, it should be
uniform throughout the county;—and the requisite of proportion,
or equality and justice, can be answered in no other way.

In Ohio, where the constitution requires that taxation shall be uni-
form, the court say, " taxing by a uniform rule requires uniformity,
not only in the rate, but also in the mode of assessment upon the
taxable valuation.    Uniformity in taxing inplies equality in the
burdens of taxation ; and this equality of burden cannot exist with-
out uniformity in the mode of assessment as well as in the rate of
taxation ; and the uniformity must be coëxtensive with the terri-
tory to which it applies, and it must be extended to all property
subject to taxation, that all property may be taxed alike and equal-
ly."    *Bank* v. *Hines*, 3 Ohio St. 1, 15.

The constitution of Wisconsin contains a similar provision ; and
the court there say that " the act of levying a tax on property con-
sists of several distinct steps, such as the assessment or fixing the
value and establishing the rate; and, in order to have the course of
proceeding uniform, each step must be uniform, and so must the
rate.    Uniformity thus becomes equality ; and there can be no uni-
form rule which is not at the same time an equal rule, operating
alike on all property which is the subject of taxation."    *Knowlton*
v. *Supervisors*, 9 Wis. 410, 421 ; *Attorney-General* v. *Winnebago
Lake Co.*, 11 Wis. 35.    " The constitution of the state requires, as
a rule in levying taxes, that the valuation must be uniform and in
all cases alike or equal, operating alike on all the taxable property
throughout the territorial limits of the state or municipality within
which the tax is to be raised.    It has fixed one unbending, uniform
rule of taxation ; and property cannot be classified, and taxed, as
classed, by different rules.    When the property is prescribed, the

rule of taxation must be uniform." *Lumsden* v. *Cross,* 10 Wis. 282; *Gilman* v. *Sheboygan,* 2 Black 510. The case of *Attorney-General* v. *Winnebago Lake Co.,* 11 Wis. 35, involved the validity of a statute similar to *c.* 63, the defendant company being required to pay into the state treasury a percentage of their gross receipts; and it was held in conflict with the constitution. A uniform rate per cent. must be levied upon all property subject to taxation according to its true valuation in money, so that all may bear an equal burden. *Zanesville* v. *Richards,* 5 Ohio St. 589; Burroughs Tax. 62.

The same doctrine is held in Minnesota, where the constitutional provision is similar. *Stinson* v. *Smith,* 8 Minn. 366, 372; *Sanborn* v. *Rice Co.,* 9 Minn. 273;—and in Illinois—*Chicago* v. *Larned,* 34 Ill. 203; *Ottawa* v. *Spencer,* 40 Ill. 211; *Holbrook* v. *Dickinson,* 46 Ill. 285;—and in Nevada—*State* v. *Eastabrook,* 3 Nev. 173, 177; *State* v. *Kruttschnitt,* 4 Nev. 178;—and in Missouri—*Crow* v. *The State,* 14 Mo. 237.

It is true, there are cases where a different doctrine is held; but they are in states in which the constitution contains no provision requiring that taxes shall be proportional and reasonable, or that they shall be equal, or that they shall be assessed by a uniform rule, or any similar form of expression, limiting the power of the legislature in this respect. Such are the cases of *Weber* v. *Reinhard,* 73 Penn. St. 373; *Durach's Appeal,* 62 Penn. St. 491; *Bright* v. *McCullough,* 27 Ind. 223; *Butler's Appeal,* 73 Penn. St. 448; *Grim* v. *School-District,* 57 Penn. St. 433. In *Weber* v. *Reinhard,* the validity of the tax is placed expressly on the ground that there is no provision of their constitution requiring equality, and the inference fairly is, that if there were such provision the tax could not be upheld. In *U. S. Express Co.* v. *Ellyson,* 28 Iowa 370, the court hold a tax similar to that imposed by *c.* 63 valid, because there is no constitutional provision requiring uniformity or equality in taxation, and they concede that if there were, the tax could not be collected.

If, then, the construction given to the constitutional provision in 4 N. H. 560, and to similar provisions in Massachusetts and in other states, is correct, *c.* 63 cannot be sustained. It imposes a tax of two per cent. on gross receipts, or, in lieu of that, five dollars per mile for the number of miles of railroad over which the business is done, thus impliedly taxing those only who do express business over a railroad, and thereby excepting from its operation business no part of which is done over railroads. This is in no sense a tax on property, or on polls or estates. It does not regard the capital invested, the expenses incurred, or the losses sustained. And if by any process of reasoning it could be held a tax on property, the tax imposed is not proportional and reasonable. It is based, not on valuation, but on business; not on the amount of capital invested, but on the capacity for business of the managers or owners; not on net profits, but on gross receipts. The gross receipts of one company

may be small, and the net profits large; while of another, the gross receipts may be large and the profits small,—or there may be none at all. It makes no allowance for the skill, experience, business tact, or enterprise of the owners or managers, but all these which enter into the gross receipts are thus made to pay a share of the taxes.

The tax assessed bears no such proportion to the whole sum to be raised as the property of the tax-payer bears to the whole taxable property; and it is open to the further objection, that it is double taxation,—for not only is the property employed in the business taxed, but its capacity to earn money, as evidenced by the gross earnings, is also taxed. It is the same in principle as if all the horses or oxen in the state were taxed, and then the owners were required to pay a percentage of their gross earnings. There is no provision for deducting the amount of the tax assessed on the capital: and herein is another element of inequality. It is not imposed in proportion to the whole amount to be raised by assessment on all the property in the state. It is a fixed assessment laid on a certain class of persons regardless of the amount called for from other property, or the percentage assessed on the valuation of other property. It is the same in all cases, whether the property invested or the profits received are large or small. The amount raised is limited only by the success of the persons engaged in the business, without reference to the amount required by the state. If in any case a tax of this character could be levied on business, even then this statute could not be sustained. It is not a tax on all business alike, but one particular kind is singled out from all the others without regard to whether it is advantageous or injurious to the community, and made to bear the whole burden placed on business.

The idea of proportional and reasonable or just and equal taxation is founded on the declaration in the bill of rights, that every member of the community is bound to contribute his share in the expense necessary to the protection of his property. This proportion is wholly destroyed by fixing a tax upon value on one kind of property, and a tax on gross receipts upon another. While the amount to be raised on other kinds of property depends upon the amount required for public objects, and the rate of taxation depends upon the amount of property within the taxing district and the public necessities, under the statute in question the rate is always the same. There can be no proportion or equality between that which is fixed and that which is uncertain and fluctuating. If the legislature could legally enact such a statute, there is nothing to prevent them from placing the whole expense of the government upon any one class of business. They can effectually destroy any business which they choose. The arguments against this law regarded as imposing tax on property apply with equal force if it be regarded as an excise.

Upon these views the conclusion is that no part of the act in question can be supported under the constitution, for there is no warrant for the imposition of any other tax than one assessed upon a proportional and equal valuation of all the different kinds of property on which it is to be levied. We are not unmindful of the importance of the question, and of the difficulty and delicacy of the duty laid upon us, and the considerations by which we should be guided in deciding questions of this character; but when there is a plain and unmistakable conflict between the legislative act and the constitution, however ungrateful the task, we are bound to say that the law must give way, and the constitution be given its full force and effect.

DOE, C. J. The question is of the constitutionality of chapter 63 of the General Laws, by the terms of which every railroad expressman is required to pay annually to the state, for a license, either two per cent. of the gross receipts of his business, or five dollars per mile. The unconstitutionality of an unequal division of public expense among New Hampshire tax-payers has been settled too long, and by too many decisions, to be a subject of debate or doubt. The question is, not whether an unequal division is constitutional, but whether this statute is a provision for dividing public expense among tax-payers; whether, in its operation and legal character, it is a violation of the rule of equality; and, if unequal, whether it is an exercise of some other power than that of taxation. The answer of this question requires a precise understanding of the reason and scope of the settled rule, its origin and history, and the end it is designed to accomplish. It is to be intelligently applied as a broad, fundamental, and rational principle, not as an arbitrary formula or mere technical method, and with due regard for precedents, legislative and judicial.

There have been in our taxation some inequalities merely nominal, and others not so substantially unjust as to have any weight as precedents of actual wrong, or as authorities for the introduction of exceptions to the rule. "Even after the Revolution, and the adoption of the constitution, although perhaps substantial justice was administered in most cases, little can be claimed for the courts on the score of their scientific administration of the law, according to strict legal rules. It was not in the very nature of things that legal investigations should be pursued at that day as they have been since." *Pierce* v. *State*, 13 N. H. 536, 557, 558. In that case Judge *Parker* explains why we do not look with confidence to the period immediately succeeding the Revolution for judicial precedents. And the want of legal learning and skill was not confined to the courts. The people, few in number, recovering laboriously from the effects of the war, concerned themselves with practical results. With little leisure for seeking grievances in mere formal defects of their own legislation, paying little attention

to the difference between the tax power and other powers, and largely controlled in their views of public affairs by their pre-constitutional usages, they were satisfied with customary modes of assessment that did not appear to them substantially inequitable. Their tax laws were manifestly designed to be just, and were specially calculated to avoid the injustice of inequality in assessors' valuations. They were adapted, by such legislative skill as undertook the work, to the situation of the community. And, considered in view of that situation, and the influence of ancient usage upon public perceptions and public judgment, they were not so materially unfair, at the times of their enactment, as to furnish any evidence of a prevailing opinion that an unequal division of public expense was an exercise of the tax power.

Much of their operation was essentially equalized by an approximate uniformity of value, amount, and condition, that has now disappeared. Inequality of operation, gradually introduced by new subjects of taxation, and by increased differences in the values and varieties of old ones, has been met by legislative efforts to rectify the wrong. Such changes have taken place that methods of dividing the public expense, equitable enough for practical purposes in the last century, would now be good cause of complaint. A great mass of questions of constitutional administration, to be raised by the progress of society, and the enlarged and complicated industries and interests of future generations, were left for those generations to solve.

The title of the tax act of Feb. 7, 1789, is "An act to establish an equitable method of making rates and taxes." Its preamble is, " Whereas it is necessary that there should be an equitable rule established by law for making rates and taxes within this state, so that every person may be compelled to pay in proportion to his or her estate." Its first section is, "That henceforward all public taxes shall be made and assessed in proportion to the amount of each person's poll and ratable estate, which shall be as follows, viz., All male polls from eighteen to seventy years of age shall be estimated at ten shillings each : horses and oxen which have been wintered five winters, three shillings each," &c., &c. This pre-constitutional system of assessment (60 N. H. 91) was continued after 1784, not because it was practically disproportional and inequitable, but for its great advantages of uniformity and convenience, and because, under the inherited customs and other circumstances of the time, it seemed to the legislature a reasonably accurate application of the rule of equality. If they had understood an equal division of public expense was not their own right and duty, and the right of their constituents, or that they were authorizing a division grievously or substantially unequal, they would have been less explicit and less urgent in their proclamation of the necessity of such an equitable assessment as would compel every person to pay in proportion to his or her estate. Their

express assertion of the necessity of an equal division is conclusive evidence of their opinion.   Other tax laws contain abundant proof that equality was understood to be the duty of the government and the right of the people.

Even if it could be shown that they who adopted the constitution understood it authorized an unequal division of public expense, we have their authority for adhering to the plain meaning of the document.   The legislature exercised judicial power after the adoption of the constitution, as they did before, in reversing judgments and granting new trials : and that illegal procedure was not discontinued until it had flourished, under constitutional prohibition, for the space of thirty-four years.   *Merrill* v. *Sherburne*, 1 N. H. 199.   For a shorter time, the ascendency of usage over legal rights was still more conspicuous in New Hampshire slavery.   By the acts of April 12, 1770, Jan. 2, 1772, and July 2, 1776, slaves were taxed, like horses and cattle, to their owners.   The constitution took effect June 2, 1784.   Ten days afterwards, a general tax law was passed (by the first legislature of the constitution), which repealed the act of 1776, and followed the form of that act in making slaves taxable, like other property.   "All male slaves from eighteen years old to forty-five, ten shillings each.; all female slaves from sixteen years old to forty-five, five shillings each ; horses and oxen, four years old and upward, three shillings each ; cows four years old and upward, two shillings each," is the language of the act of 1784.   This statute, and the continued taxation of slave property, show that the New Hampshire convention who copied the Massachusetts constitution, and the New Hampshire people who adopted it, did not understand that by its adoption they abolished slavery.   In 1789 another general tax law repealed the act of 1784.   In the list of taxable property, in the law of 1789, the item "slaves" was omitted.   The cause of the omission undoubtedly was the decisions, in Massachusetts jury trials, that slavery was illegal, and the charges given to the juries by the court in those trials, that slavery was inconsistent with the declaration of freedom and equality in the bill of rights.   *Orr* v. *Quimby*, 54 N. H. 590, 633.   New Hampshire accepted the Massachusetts construction of that declaration, and struck "slaves" out of the list of taxable property.   Our ancestors thus acknowledged that by adopting the constitution they had unintentionally abolished slavery ;. and that men and women, for years unconstitutionally held as slaves, had been for years unconstitutionally taxed as property.   By their acknowledgment and correction of this constitutional error, a precedent was established that is entitled to consideration in other cases (if others are found), in which their practice was not consistent with the express terms and clear meaning of the constitution.

So far as this case is concerned, the constitution has not been changed since the provisions on this subject were written, in 1781

(9 Prov. Papers 852), when they were largely copied from the Massachusetts constitution of 1780. The Massachusetts form was, " The department of legislation shall be formed by two branches, a senate and house of representatives, each of which shall have a negative on the other." 1 U. S. Charters and Consts. 960. The New York form (of 1777) was, " The supreme legislative power within this state shall be vested in," &c. 2 U. S. Charters and Consts. 1332. The New Hampshire copy is, " The supreme legislative power within this state shall be vested in the senate and house of representatives, each of which shall have a negative on the other." The items of legislative power, set forth in articles 4, 5, and 6 of the second part of our constitution (not including the proviso inserted in 1877), are for the most part a copy of Massachusetts articles 3 and 4, which (except the last paragraph— the model of our article 6) were copied from the Massachusetts province charter. 1 U. S. Charters and Consts. 951, 952. Thus it happens that the specification of New Hampshire legislative power, in articles 4 and 5, is, in general, the language of the law-officer of the crown, who in 1691 drew up the province charter of Massachusetts in the prolix style of the public and private law documents of that age.

That charter authorized the general court to impose and levy proportional and reasonable assessments, rates, and taxes. This was copied by the committee of the Massachusetts constitutional convention, who made the first draft of the state constitution. The convention added this clause: " And also to impose and levy reasonable duties and excises upon any produce, goods, wares, merchandise, and commodities." Journal of the Convention 60, 198, 229; 4 Works of John Adams 233. This clause the New Hampshire convention omitted. If they omitted it because they feared it would be a pretext for an unequal division of public expense, their fear has been justified by the result in Massachusetts. *Portland Bank* v. *Apthorp*, 12 Mass. 252, 255; *Com.* v. *P. F. C. Savings Bank*, 5 Allen 428, 431; *Com.* v. *L. G. L. Co.*, 12 Allen 75, 76; *Com.* v. *H. M. Co.*, 12 Allen 298, 300; *Com.* v. *P. Institution*, 12 Allen 312, 313; *M. Ins. Co.* v. *Loud*, 99 Mass. 146; *Att'y-Gen.* v. *B. S. M. Co.*, 99 Mass. 148, 152, 153; *Com.* v. *L. S. Bank*, 123 Mass. 493, 495; *Com.* v. *B. S. Bank*, 126 Mass. 526, 530. These cases, and *Oliver* v. *W. Mills*, 11 Allen 268, 274–279, *Cheshire* v. *C. Commissioners*, 118 Mass. 386, 389, and *Fall River* v. *C. Commissioners*, 125 Mass. 567, may be authorities against the validity of the act on which this suit is brought. But, as it seems to be understood in Massachusetts that the tax power of that state is granted only by the proportional tax and excise clauses, and as the tax power of New Hampshire is included in the grant of the supreme legislative power (subject to the limitation of equality on which the whole government is founded), it may be doubtful whether much light is thrown upon this case by the Massachusetts

decisions. And any law or practice of Massachusetts, or any other jurisdiction, American or foreign, in which either the rule of equal rights does not prevail, or taxation is an exception to that rule, is not an authority on which an unequal division of public expense can be made in this state. *Weber* v. *Reinhard*, 73 Penn. St. 370; *State* v. *Railroad*, 45 Md. 361; *New Orleans* v. *Kaufman*, 29 La. Ann. 283; *Commissioners* v. *Nelson*, 19 Kan. 234; *A. U. Express Co.* v. *St. Joseph*, 66 Mo. 675.

It may be doubted whether the general grant of supreme legislative power, in the second article of the second part of our constitution, is much affected or explained by the grant of specific legislative powers, copied, in the fourth and fifth articles, from a copy of a diffuse English state paper. It may be doubted whether the supreme legislative power of article 2 does not include the specific legislative powers of articles 4 and 5, and whether the grant of the latter is not superfluous. Article 5. requires that all laws shall be not repugnant or contrary to the constitution, and again imposes the same condition upon a certain class of laws. This restriction is unnecessary, because the constitution is the supreme law. In the same article is a special grant of the power of taxation, accompanied by the limitation that taxation shall be proportional. As this grant is unnecessary, because included in the grant of the supreme legislative power in article 2, so the limitation is unnecessary, because immunity from an unequal division of public expense is reserved in the bill of rights, which, according to the testimony of its makers, "contains the essential principles of the constitution," "is the foundation on which the whole political fabric is reared, and is consequently a most important part thereof." *Gould* v. *Raymond*, 59 N. H. 260, 275.

The bill of rights is a bill of their equal, private rights, reserved by the grantors of public power. The reservation precedes the grant. Before they create the power of proportional taxation in the fifth article, and the supreme legislative power in the second article, and before they form themselves into a state in the first article, they lay the foundation, and therein reserve those personal liberties, which, upon the evidence of history and their own experience, they think cannot safely be surrendered to government. The definition of taxation, given in the foundation, is taken from books with which the leading statesmen of the Revolution were familiar. " The public revenues," says Montesquieu, " are a portion that each subject gives of his property, in order to secure or enjoy the remainder." Spirit of Laws, *b.* 13, *c.* 1. Government is formed by men for the common good, for the preservation of their lives, liberties, and estates, and the enjoyment of them in peace and safety; and " it is fit every one who enjoys his share of the protection should pay out of his estate his proportion for the maintenance of it." Locke on Government, *b.* 2. *c.* 9, *ss.* 123, 124, 131; *c.* 11, *ss.* 134, 140. Government, says the bill of rights, is " instituted

for the general good," " for the common benefit, protection, and
security of the whole community." Arts. 1, 10.  " Every member
of the community has a right to be protected by it in the enjoy-
ment of his life, liberty, and property.  He is therefore bound to
contribute his share in the expense of such protection."   Art. 12.
Upon every member of the community is laid a constitutional obli-
gation to contribute his share of public expense.   " He is * * bound
to contribute his share."   The reason is given.   He is entitled to
the common benefit, protection, and security for which government
is instituted; he has a right to be protected in the enjoyment of
life, liberty, and property :  " he is therefore bound to contribute
his share" of the expense.   The right of benefit and protection,
and the duty of contribution, are reciprocal.   The former is the
consideration for the latter.   The latter is the price of the former.

If the governmental expense of a state prison, county alms-house,
town highway, district school, or other common benefit, is $1,000,
that expense is a tax to be paid by those who, in contemplation of
law, enjoy or have a right to enjoy the benefit, and who are the
joint purchasers of it through governmental agency.   *B. Mills Co.*
v. *W. Location*, 60 N. H. 156.   The benefit and the expense may
be either universal or local.   *B. C. & M. R. R.* v. *State*, 60 N. H. 87,
90, 95 ; *Gould* v. *Raymond*, 59 N. H. 260, 276, 278.   In either
case, the purchasers' shares of the price cannot be ascertained with-
out proportion.   The obligation of each to contribute " his share "
requires an equal division.   The legal as well as the arithmetical
and common meaning of " his share " is the constitutional doctrine
of taxation.   Every one's tax being his share of public expense, an
unequal division of that expense is not taxation.   If one contrib-
utes more than his share, some other one necessarily contributes
less than his share ; and if one pays less than his share, somebody
else necessarily pays more than his.   Each one's payment of his
share is not merely his constitutional duty; it is the constitutional
right of his neighbors.   *Morrison* v. *Manchester*, 58 N. H. 538, 549 ;
*Edes* v. *Boardman*, 58 N. H. 580, 587.   And as his non-payment
of his full share is a violation of their right, so his forced payment
of more than his share is a violation of his right.

The right of acquiring and possessing property is constitutionally
reserved.   Bill of Rights, art. 2 ; *Ash* v. *Cummings*, 50 N. H. 591,
613 ; *Eaton* v. *Railroad*, 51 N. H. 504, 510, 511 ; *Orr* v. *Quimby*,
54 N. H. 590, 594, 597, 599, 616, 618, 638, 640 ; *Sharpless* v.
*Philadelphia*, 21 Penn. St. 147, 166 ; *A. & N. Railroad* v. *Baty*,
6 Neb. 37.   Private property can be taken by the tax power, col-
lecting equally from all joint purchasers of public benefits the
shares of the price due from them.   Any one's nonpayment of his
share is a compulsory payment of his debt by his neighbors, which
is, in effect, a compulsory gift of their money to him for his private
use.   If assessors can be authorized to issue a warrant requiring
the tax-collector to take from A $10 more than his share, and from

B $10 less than his share, and pay the same into the public treasury, the same warrant can require the same collector to take from C and D their shares for the public treasury and the public use, and also to take $10 from C and give it to D for his private use. The difference between the case of A and B, and the case of C and D, would be a matter of immaterial form. To the extent of $10, each case would be, not a division of public expense, but the collector's transfer of money from its owner to another person, not in satisfaction of any constitutional, legal, or equitable claim, nor in the exercise of any constitutional, legal, or equitable right, public or private. To that extent, the intervention of the collector would be an unmeaning ceremony, and an unnecessary circuity. For the purpose of legality, the private levy, made by him for B and D, might as well be made by them. A statute authorizing it to be made by him or them would not be law of the land, within the meaning of the fifteenth article of the bill of rights. Cool. Const. Lim. 357. A's and C's ownership being a constitutional right, their property could not be taken by eminent domain for public use without the compensation due them as vendors, nor by taxation without the compensation due them as purchasers of public benefits. It could be taken by either power for a public purpose only, and, when so taken, compensation would be an indispensable recognition and maintenance of ownership. For a private purpose, property cannot be taken by either power, either without or with compensation. Cool. Const. Lim. 175, 498, 530, 559; 2 Dill. Mun. Corp., s. 736.

"Neither has the legislature any constitutional right     *     *     * to raise funds for a mere private purpose. No such authority passed to the assembly by the general grant of legislative power. This would not be legislation. Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interests or welfare, it ceases to be taxation, and becomes plunder. Transferring money from the owners of it into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional for all the reasons which forbid the legislature to usurp any other power not granted to them." *Black*, C. J., in *Sharpless* v. *Philadelphia*, 21 Penn. St. 147, 169.

To the extent of its inequality, a disproportional division of public expense is an uncompensated and unauthorized transfer of private property, for a private purpose, from those who bear more than their shares of the common burden to those who bear less than their shares. *Morrison* v. *Manchester*, 58 N. H. 538, 550. To the extent of its inequality, it is not a division of anything, and the so-called expense is not an expense, public or private. A power thus to dispose of a part of any one's estate would be a power to make the same disposition of the whole of it. All the property of all may be proportionally taken as their shares of the

cost of war, police, the protection of life, liberty, health, and morals, and other public work, deemed an equivalent (Bill of Rights, art. 3), and compensation for their property. Taking the whole would be an exchange. Under our constitution, the power to tax is a power not to destroy the right of property by a discriminating process of classification or selection, but to equitably defray the expense of protecting the right of property and other rights. Dividing the expense is the exercise of a power which in its nature acknowledges the limit of equal contribution, and the legal existence of the rights for whose defence and advancement the power is created. But if some could be compelled by it to contribute a part of their neighbors' shares, all their property, beyond the amount of their own shares, could be taken for the same purpose. The purpose, being private, would be unauthorized. The lack of remuneration would be a mere aggravating circumstance of a lawless transaction. The taking for the private purpose, without compensation, could be justified only on the ground that there is no constitutional reservation of the right of owning property. No other right is more intelligibly reserved. That right could not have been more clearly retained; and if it is not inviolable, there is no constitutional right of any kind, and it is impossible to put in writing a reservation of rights that could not easily be changed into a surrender of them by judicial construction.

The contract theory of the origin and object of government having become practical law in this state in 1784, we need not inquire into its previous soundness as a matter of political speculation or historical fact. Locke's statement of it is, Men being, by nature, all free, equal, and independent, no one is subjected to the political power of another without his own consent: the only way whereby any one divests himself of his natural liberty, and puts on the bonds of civil society, is by agreeing with other men to join and unite into a community for the preservation, security, and enjoyment of their lives, liberties, and estates. Thus the origin of government is in mutual consent or contract, and its object is the common benefit. Men, when they enter into society, give up rights which they had in the state of nature into the hands of the society, to be exercised for the preservation of themselves, their liberty, and their property. Treatise on Government, b. 2, cc. 7, 8, 9, 11. The bill of rights declares that all men are born equally free and independent; therefore, all government of right originates from the people, is founded in consent, and instituted for the general good. When men enter into a state of society, they surrender up some of their natural rights to that society in order to insure the protection of others. Government is instituted for the common benefit, protection, and security of the whole community, and every member of the community has a right to be protected by it in the enjoyment of his life, liberty, and property. Upon this constitutional establishment of the basis and authority of society, the

creation of government by a social contract is not a mere theory. For legal purposes, the original contract is made when, with such a bill of rights, "the people inhabiting the territory formerly called The Province of New Hampshire  *  *  solemnly and mutually agree with each other to form themselves into a free, sovereign, and independent body politic, or state, by the name of The State of New Hampshire." Const., part 2, art. 1. Whether sound or unsound as a theory, the doctrine of the social contract, being organic law, cannot be officially controverted by either branch of a government thus created. And neither that doctrine, nor any express or implied stipulation of the contract, extends the authority of either branch of the government beyond the exercise of delegated, limited, and divided power, in a prescribed manner, for the common benefit. 1 Bl. Com. 47, 48, 49, Sharswood's notes.

In the supposed state of nature, men exercise the natural, essential, and inherent right of acquiring and possessing property as best they can. By mutual agreement, establishing an agency called government, they impose upon it various duties, including that of protecting the natural and reserved right of acquisition and possession, and the duty of enforcing every one's obligation to contribute his share of the expense. Equally free and independent, they do not agree to contribute disproportionally. They do not give their agent a power of dividing their public expense unequally, which would be an unlimited and unnecessary power of transferring private property from its owner, without compensation, to another person, for a use and purpose entirely private. Such a transfer would be neither a protection of life, liberty, or property, nor a collection of the public expense of protection, but a mere destruction of the right of property by a servant, whose duty and authority are expressly limited to such protection and collection. And so long as constitutional government continues to be the execution of a written agreement, creating a limited agency for the purchase of common benefit, protection, and security, by proportional contribution, the contract can no more be executed by an unequal division of the expense, than the right of property can be protected by such an unauthorized extinguishment of it.

Government is "instituted for the common benefit, protection, and security of the whole community, and not for the private interest or emolument of any one man, family, or class of men." Bill of Rights, art. 10. The formation of a favored class is not a purpose of the contracting parties, and therefore not a power delegated by them. By a selection of subjects of taxation, or other method of classifying persons, requiring some to pay their neighbors' shares of public expense, the community would be divided into inferiors and superiors; and the agency, established for the common benefit of all, would be carried on, without authority, for the private interest and emolument of the privileged class,

to whom, for no public purpose, others would be forced to pay annual tribute. The custom of New Hampshire slavery, which transferred to some the ownership of the earnings and labor of others, having been abolished by the first reservation of the contract, it is impossible, under that and other reservations of equal rights, to introduce an inequality of classes that would differ in degree only, and not in legal principle, from the custom that vested in one class the entire product of the industry of another class. Equality is not one of many grades of servitude, nor a partial freedom from legal inferiority.

If equality were not retained by express reservations, and proportion were not expressly required by the fifth article of the grant, the contract would not authorize an unequal partition of the common burden. The people having voluntarily agreed with each other to form themselves into a body politic, the legal meaning of the written agreement is their intention and understanding, shown by competent evidence. There is no presumption of law or fact that they intended to share the expense disproportionally. An intention to subject themselves to disproportion cannot be implied from the nature of the enterprise, and can be proved only by an express stipulation of the contract, or other competent evidence. There is no such stipulation in the writing, and neither there nor elsewhere is there any competent or incompetent proof of such an intention. Sharing the expense among themselves, equally or unequally, would not be an exercise of the war power of confiscating the property of public enemies. *Miller* v. *U. S.*, 11 Wall. 268, 305, 306, 315.

The supreme legislative power is the supreme power of making law. An unequal division of public expense would be a transfer of private property from its owner, without his consent and without compensation, to another person, for no purpose of public benefit. And such an act of violence, not being public belligerent confiscation, would not be law, nor the enactment or enforcement of law. Cool. Const. Lim. 175; *Loan Association* v. *Topeka*, 20 Wall. 655, 662, 663, 664. In no legal sense would it be a rule of civil conduct. 1 Bl. Com. 44. It would no more be law within the meaning of the grant of law-making power, than it would be law of the land within the meaning of the fifteenth article of the bill of rights. "The whole of a public burden cannot be thrown on a single individual under pretence of taxing him, nor can one county be taxed to pay the debt of another, nor one portion of the state to pay the debts of the whole state. These things are not excepted from the powers of the legislature, because they did not pass to the assembly by the general grant of legislative power. A prohibition was not necessary. An act of assembly, commanding or authorizing them to be done, would not be a law, but an attempt to pronounce a judicial sentence, order, or decree." *Black*, C. J., in *Sharpless* v. *Philadelphia*, 21 Penn. St. 148, 168. It would not.

be an exercise of any power granted to either branch of the government. *Ashuelot R. R. Co.* v. *Elliot*, 58 N. H. 451, 456–458.

When exactness is impracticable in the exercise or vindication of an asserted right, it does not follow that the right does not exist, or that it is incapable of judicial vindication. Slavery was abolished by the reservation of equality, notwithstanding the historical and inevitable fact of inequality. The common right of light and air cannot be correctly divided; but the whole title is not therefore vested in the strongest, or in those whose number and combination for the time being make them an effective majority. There are many rights that cannot be mathematically adjusted. Rights of property, reputation, person, and family, are generally defended by due process of law, using a measure of damages far less accurate than arithmetical computation. Equality, being practically the source and sum of all rights, and the substance of the constitution, is not abolished by the impossibility of maintaining and enjoying it with precision. Many requirements of the common law, the statutes, and the constitution, are answered by approximations, reasonably free from error, and sufficient for the practical purposes of substantial justice. The difficulty of dividing public expense into the shares which the members of the community are bound to contribute, does not insert in their contract a power of imposing the share of one man, family, or class of men upon another man, family, or class.

Such a power could have been inserted in 1784. "All men are equally free; but some may be involuntarily bound to the service of bearing others' shares of the common burden. All men have the natural, essential, and inherent right of acquiring and possessing property; but, in dividing public expense, this right may be violated by transferring any one's property to some other person or persons, for no public purpose, and without compensation. Government is instituted for the common benefit, protection, and security of the whole community, and not for the private interest or emolument of any one man, family, or class of men; but, in the division of public expense, the ends of government may be perverted by classification. Every member of the community has a right to be protected by it in the enjoyment of his life, liberty, and property; he is therefore bound to contribute his share in the expense of such protection: but this obligation is not a constitutional one; the share which one member is bound to contribute may be collected from another member; and all the property of one man, family, or class of men may be taken by taxation to protect the untaxed property of another man, family, or class. No subject shall be deprived of his life, liberty, or estate but by the judgment of his peers or the law of the land; but, without fault, trial, notice, or compensation, his estate may be taken from him and given to his neighbors, for a private purpose, by a classifying method of dividing public expense; and making such a transfer

by an act entitled an act of taxation, is making law within the meaning of this instrument. Authority is granted to impose and levy proportional and disproportional assessments, rates, and taxes." By such a contract, taxation might have been made an exception to the rule of equal rights.

An act entitled an act of taxation may be valid, although not an exercise of the power of collecting the constitutional shares of expense. The title may be an immaterial misnomer and error of form only, and the act may be an exercise of some of the other powers which provide for the common benefit, protection, and security, and which may be conveniently grouped under the name of the protective power. A fine, imposed by this power, is practically as useful to the government as a tax of equal amount; and a protective law is not invalid merely because it produces public revenue. Vice, pauperism, and crime may be suppressed and prevented by a variety of measures. In behalf of property, health, life, and morals, the social contract may be performed by destroying buildings, burglars' tools, gambling and counterfeiting implements, and intoxicating liquors. The spread of fire, and physical, mental, and moral disease, may be stopped by vigorous action. Destruction may be protection. *Peirce* v. *State*, 5 How. 504, 589. For the common security, by the judgment of his peers and the law of the land, an offender may be deprived of his estate, liberty, and life. Wrong may be obstructed and repressed by methods less severe than capital punishment. The protective power may seek, by mild courses, to lessen an evil, or check its increase. Instead of destroying the life, liberty, or property of wrong-doers, it may discourage their noxious business, and restrain it within certain bounds.

In 1715 it was enacted, that "to prevent nurseries of vice and debauchery" there should be a limitation of taverns and ale-houses, and that the general sessions should license no more than eighteen in the province. Laws, ed. 1771, *p.* 59. The constitution did not abolish the right to restrain the sale and use of intoxicating liquor. *Pierce* v. *State*, 13 N. H. 536, 571, 572. A license or excise law tending to control and hinder the consumption of such liquor may be an act of the protective power. Cool. Const. Lim. 581–584; *State* v. *Cassidy*, 22 Minn. 312. The power that can destroy an article because its use is hostile to the common welfare, may endeavor to diminish the use by an excise increasing the price. In 1787, one of Hamilton's arguments for the adoption of the federal constitution was, that by a federal duty on imports the single article of ardent spirits might be made to furnish a considerable revenue; that at a shilling per gallon it would produce £200,000; that it "would well bear this rate of duty; and if it should tend to diminish the consumption of it, such an effect would be equally favorable to the agriculture, to the economy, to the morals, and to the health of society." The Federalist, No. 12. The protective operation of such a law was put forward as an argument in its

favor. The New Hampshire liquor excise law of 1781 (amended in 1782) was, by the act of June 27, 1787, amended and recognized as continuing in force after the adoption of the constitution. September 28, 1787, the liquor excise was increased. The liquor law of 1838 was a regulation of the internal liquor trade of the state. " One object to be effected by it must have been to place the trade in liquors, where it existed, in the hands of suitable persons to be entrusted with such business ; and another was, doubtless, by the diminution of the consumption of them, to prevent in some measure the manifold evils arising from intemperance, and to secure to the people the benefits to be derived from its suppression, so far as the act might have that effect." *Pierce* v. *State,* 13 N. H. 536, 582, 583—*S. C.,* 5 How. 504.

Notwithstanding the omission of the excise clause in our copy of the Massachusetts constitution, the power that can destroy liquor can put upon it an excise as a discouragement of its existence. It may be subjected to a depressing and destructive excise by the same statute that authorizes its extirpation by the ordinary mode of abating nuisances. And if the excise thus imposed is called a tax, it may nevertheless be protection. The constitutional question is not so much of the names as of the substance of things. The preambles of the liquor excise laws of 1781 and September 28, 1787, indicated that revenue was the sole object of those laws; and the title of the latter was " An act to raise a revenue to this state by excise." Whether any statute, evidently understood and intended by the legislature to be an act of the tax power, can be sustained as an act of the protective power, is a question that need not now be considered. But it is material to observe that if an excise or license law, enacted solely for a protective purpose, has a practical tendency to accomplish that purpose, its production of revenue is no more unconstitutional than the derivation of revenue from fines in criminal cases.

The congress of the confederation of 1778–1789 had no power to levy taxes or to raise revenue. 1 Story Const., *ss.* 232, 240, 253–258; 1 U. S. Charters and Consts., *p.* 7, art. 2; *p.* 8, arts. 5, 6; *p.* 9, arts. 8, 9. Our state constitution was substantially a national one from 1784, when it took effect, to 1789, when the federal government went into operation. And it is national now, except in those matters in which national power has been granted to the Union. Before the supreme legislative state power of laying duties on imports was suspended by the federal constitution, we had state tariff laws. The preamble of the New Hampshire tariff act of 1786 was, " Whereas the laying duties on articles of the produce and manufacture of foreign countries will not only produce a considerable revenue to the state, but will tend to encourage the manufacturing many of those articles in the same." That was an express avowal of the double purpose of revenue and encouragement of home manufactures. Nails were among the articles named in the

act. The preamble of an act of 1789, entitled "An act to encourage the making of nails within this state," was, "Whereas a general manufacturing of nails within this state would prevent great sums of money being sent abroad for purchasing that necessary article, and may be a means of employing many poor people, whose time will otherwise be misspent and totally lost to themselves and the community." The act offered a bounty for the manufacture of every hundred thousand of wrought twenty-penny, ten-penny, six-penny, and four-penny nails.

Another act of 1786, entitled "An act to encourage the manufacturing of linseed oil within this state," reciting in a preamble that "the manufacturing of oil from flax-seed within this state will furnish employment for poor persons, have a happy influence on the balance of trade, and greatly contribute to the wealth of the good subjects of this state," exempted linseed oil mills from taxation for ten years. By an act of 1787, mills for slitting, rolling, and plating iron, and shops for making nails, were exempted from taxation for ten years. The owners of such mills were to have annual abatements for seven years in their taxes for as many poll-taxes as they employed of proper workmen in such mills. A bounty of £100 was offered for the erection and completion of such a mill within one year, being the first of that kind in the state; and the first mill, with its mill privilege, was exempted from taxation so long as it continued to be occupied in the business. In 1789, by a similar act, the manufacture of sail-cloth was encouraged. In 1792, a ten-years act, entitled "An act to encourage the manufacture of malt liquors," subsidized brewers by exemption from taxation, for the alleged reason (stated in the preamble) that "the manufacture of malt liquors in this state will tend to promote agriculture, diminish the use of ardent spirits, and preserve the morals and health of the people." An act of 1786, reciting in a preamble that the importation of certain articles would greatly promote the manufactures of this state, allowed those articles to be imported free from duty. Another act of 1786 exempted gold and silver from import duties, on the ground (stated in the preamble) that the importation of gold and silver into this state, to exchange for produce or manufactures thereof, would much more promote the interest of the good subjects of the same than the importation of foreign luxuries. In 1816, "An act for the encouragement of manufactures" exempted from taxation for two years an amount not exceeding $10,000 of "capital stock employed in each and every manufactory now established in this state, for the manufacturing of cotton yarn and cotton cloth, of woollen yarn and woollen cloth, and of salt."

The payment of a bounty or subsidy out of the public treasury, by the protective power, may be made in the form and under the name of a tax exemption. "A law which subjects all real estate to taxation except houses of public worship and parsonages, thus subjecting all other estates to direct contribution to the public

charges, as effectually compels all such other to contribute to the support of the institution that maintains the church and parsonage as by a direct appropriation to that object.    In its practical effect, such exemption is a direct subsidy from the state to the church." Report of Judge Sawyer, Chairman of Tax Commissioners (1876), *p.* 39.    Tax exemption has been adopted as a method of expending public money.    The protective power has been exercised by giving bounties of exemption from taxation, as well as by giving bounties of money obtained by taxation.    The generation by whom the constitution was adopted understood the state could pay a sum of money to an individual, for a public purpose, by exempting him from the payment of the same amount of tax.    They did not understand there would be any constitutional virtue in going through the form of collecting money from him, and immediately paying it back to him.    Whether, in all or any of the instances of exemption, the protective power has been constitutionally exercised, we need not now inquire.    That power may discourage many things that are injurious by compulsory contributions to the revenue, and encourage many things that are beneficial by payments from the revenue.    The same power has discouraged ale-houses and the consumption of intoxicating liquor, by excise, license, and prohibitory laws that brought money into the public treasury, and encouraged the manufacture of malt liquor by an exemption that was a payment of a bounty out of the same treasury.    The payment of bounties by tax exemptions, and the receipt of compulsory contributions under the protective power, though they affect the revenue, are not to be confounded with the operation of the tax power which collects the constitutional shares of the expense of protection.    Cool. Tax. 10, 11, 152; *C. P. & P. Co.* v. *Chicago,* 88 Ill. 221.

The dog tax, so-called (G. L., *c.* 115, *ss.* 12, 13), is a discouragement of owning, keeping, and raising animals that are generally unprofitable, and often mischievous.    Cool. Const. Lim. 595; *Orne* v. *Roberts,* 51 N. H. 110, 113, 114; *Ex parte Cooper,* 3 Tex. Ct. App. 489.    The sums to be paid are fixed, not by the value of the property, but by an arbitrary rule, without regard to the equality essential in a tax.    This provision of the dog law, although it calls the exaction a tax, is an act of the protective power, which, in other sections of the same chapter, authorizes the licensing, regulating, restraining, and killing of dogs as beasts, excepted by the common law out of the ordinary rules of property, and in other sections of the same chapter offers bounties for killing wolves, bears, wild-cats, foxes, and hawks.

An act of Massachusetts, in force here during the last fifteen years of our union with that colony, gave a reason for taxing itinerant merchants and peddlers in any month of the year.    Mass. Anc. Ch., *c.* 21, *s.* 5.    The New Hampshire act of 1718, entitled "An act against hawkers, peddlers, and petty-chapmen," had the following preamble: " Whereas complaint is made of great hurt to

and the decay of trade, occasioned by hawkers, peddlers, and petty-chapmen, passing to and fro through the country, to vend goods, wares, and merchandises, much of which was purloined, obtained by robbery and stealing, so that divers men of trades, handicrafts-men, and others none of the best fame, having left off the exercise of their trades and businesses, turn hawkers, peddlers, and petty-chapmen." "For remedy of which mischief" peddling was wholly prohibited, under a penalty of £20. Laws, ed. 1771, *p.* 62. This act gave a reason for exercising the protective power against peddlers; and the power that can act against the evils there mentioned, by prohibition, can also act by the lesser coercion and restraint of excise and license. Chapter 49 of the Laws of 1878 requires peddlers of lightning-rods to pay the state an annual license fee of $500. The amount of the fee, the provisions of the second section of the act, and the notorious character of much of the recent lightning-rod traffic (not unfrequently exhibited in legal proceedings), show that this legislation is protective. In the trial of suits of various kinds, including many brought by endorsees of notes given for patented articles and patent rights, it is manifest that the community are insufficiently protected against the frauds of many transient persons. Excise and license laws for the prevention or mitigation of such evils are not acts of the tax power.

In some important respects the defendants are not the equals of men in general. They have voluntarily enlisted, as common carriers, in the public service. Others, in other occupations, may sell their services to some, and refuse to sell to others; may refuse to sell to any except for an exorbitant price; and may sell to one for more, and to another for less, than a reasonable price. The defendants have not this liberty. As public servants, they are bound to render equal service to all, for an equal and reasonable compensation. *McDuffee* v. *Railroad*, 52 N. H. 430. But the difference between their public business and the private employments of others is not authority for binding them to the involuntary private service of bearing others' shares of public expense. The protective power can make provision for ascertaining and fixing the reasonable amount of their compensation in some more convenient mode than a multiplicity of suits between them and their employers. There have been statutes requiring the reasonable compensation of the proprietors of ferries, canals, and toll-bridges, and others voluntarily engaged in the public service, to be established in judicial proceedings. Act of Feb. 28, 1783 (Laws, ed. 1789, *p.* 233); Laws 1863, *c.* 2,805, *s.* 4; Laws 1878, *c.* 150, *s.* 3. But for a provision on this subject, in the case of railroad expressmen or other common carriers, an unequal division of public expense is not a constitutional substitute.

The reasonable rates of such expressmen not being fixed by legal process, a railroad-express tax law, so called, might be

designed to be an act of discouragement, like a liquor excise. It would tend to discourage the employment of railroad expressmen by increasing their rates, and to encourage other carriers who cannot successfully compete with railroad expressmen without the assistance of a protective tariff. But there is no purpose for which we can presume the statute on which this suit is brought was designed to be a discouraging or encouraging act of the protective. power.

A railroad-express tax law might be designed to be an act of taxation, laying upon railway-express transportation a burden to be equally distributed, by natural law, among the purchasers of such transportation and their customers, as a tax laid on any articles of property is distributed among the consumers or users of the article. The object might be to make the expressmen mere collectors of the tax. *Crandall* v. *Nevada*, 6 Wall. 35, 39, 40 ; *Railroad* v. *Pennsylvania*, 15 Wall. 284, 294, 298 ; *Henderson* v. *Mayor*, 92 U. S. 259, 268 ; *W. U. T. Co.* v. *Richmond*, 26 Grat. 1, 27 ; Judge *Cooley*, in 4 Southern Law Rev. (N. S.) 185, 196 ; *Morrison* v. *Manchester*, 58 N. H. 538, 554, 555. But there is nothing in the language of this statute, the nature of the business, or the history of the times, having any tendency to show that the legislature had such an object in view. And before examining the validity of the statute as an act of discouragement or encouragement, or an imposition upon the whole community of a self-distributing tax to be collected by railroad expressmen in addition to their reasonable compensation, we ought to have some evidence rebutting the presumption that the legislature did not intend to authorize such expressmen either to add to their charges as much as this statute requires them to pay to the state, or to raise their charges above the reasonable standard of the common law. It does not appear that their charges were so low in 1878 as to make it probable that the legislature intended to increase them ; and a construction authorizing an increase of them beyond a reasonable compensation would be more likely to thwart than to carry out the legislative purpose.

In its original draft the act had the title of a tax law. Report of Tax Commissioners of 1878, *p.* 186. In the Laws of 1878, *c.* 51, it had the title of a license law. In the Gen. Laws, *c.* 63, it has the title of " Taxation or Licensing." " Its constitutionality must depend upon its real character, upon the end designed and to be accomplished, and not upon its title or professions." *Pierce* v. *State*, 13 N. H. 536, 580, 582. " In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect." *Henderson* v. *Mayor*, 92 U. S. 259, 268 ; *Railroad* v. *Husen*, 95 U. S. 465, 472. " If the practical operation and effect of an assessment, authorized by an act of the legislature, would be to levy a tax on the property of certain individuals or corporations from which all others were exempt, so as to throw on

a particular class a disproportionate share of the burdens of raising money for public purposes without any equivalent benefit, it would be the duty of the court to declare it to be an unauthorized act of legislative power, irrespective of the particular form in which the assessment or tax might be imposed. The validity of the act would depend on the substantial nature and operation of its provisions, and not on the formal language in which they were expressed, or on the mode in which they were to be carried into effect." *Com.* v. *H. M. Co.*, 12 Allen 298, 301.

In no view that has been suggested, and in none that occurs to us, can this statute be held to be an act of the protective power. As an act of taxation increasing the charges of railroad expressmen beyond a reasonable compensation for their services, and employing them as collectors of a tax laid upon the general public by whom express charges are directly or indirectly paid, it lacks necessary evidence of such a legislative design. As a taxation of such expressmen, it makes an unequal division of public expense, and binds them to the private service of paying their neighbors' shares. Expressmen are subject, by general law, to the uniform taxation of the whole community. In addition to that, this special law puts upon railroad expressmen a tax which is put upon nobody else. Whether it is a tax imposed upon person, property, income, business, gross receipts, profits, or earnings, is immaterial. It is a tax which one class of men are required to pay, and from which all others are exempt. It is a perfect example of unequal division of public expense. It does not tend towards equal right by any degree of approximation, but is as distant as possible from it, and diametrically opposite to it. It is inequality, pure and simple. There are other objections which need not be considered, because this one is decisive. If a special, discriminating tax of two per cent. could be taken from one class of men alone, a similar tax of one hundred per cent. could be taken from any man, any family, or any class of men; one man, one family, or one class could be singled out, and compelled to pay all the expense of the common benefits of government, and all others could thus be discharged from their constitutional obligation to contribute their shares. The action cannot be maintained.

*Case discharged.*

FOSTER and SMITH, JJ., did not sit: the others concurred in the result.